(No. 58467.—

MICHAEL KALODIMOS *et al.*, Appellants, v. THE VILLAGE OF MORTON GROVE, Appellee.

*Opinion filed October 19, 1984.*

486

488

RYAN, C.J., and MORAN and UNDERWOOD, JJ., dissenting.

James W. Kissell, David W. Carpenter, and Ted K. Yasuda, of Sidley & Austin, of Chicago (Richard V. Houpt, Sheldon Davidson and Donald J. Moran, of Pederson & Houpt, of Chicago, and Michael K. McCabe, Richard E. Gardiner, and Robert Dowlut, of Washington, D.C., of counsel), for appellants.

Martin C. Ashman, of Martin C. Ashman, Ltd., and Thomas P. Sullivan, Michael H. Salsbury, and Eugene R. Wedoff, of Jenner & Block, of Chicago, for appellee.

Stephen P. Halbrook, of Fairfax, Virginia, and James Valentino, Jr., of Chicago, for *amici curiae* Illinois Small Business Men's Association *et al.*

Victor D. Quilici, of Bensenville, and Robert G. Johnston and Kenneth A. Michaels, Jr., of Chicago, for *amici curiae* Illinois State Rifle Association and the Illinois Gun Collectors Association.

Gregory C. Picken, of Barron, Lehman, Picken & Raskin, P.A., of Miami, Florida, for *amicus curiae* American Federation of Police.

Duane D. Morse and Valerie A. Lambiase, of Wilmer, Cutler & Pickering, of Washington, D.C. (James S.

Campbell, of counsel), for *amicus curiae* Handgun Control, Inc.

JUSTICE SIMON delivered the opinion of the court:

An ordinance of the village of Morton Grove banning the possession of all operable handguns, apparently the first of its kind in the nation, withstood a challenge under the second and ninth amendments to the United States Constitution. (*Quilici v. Village of Morton Grove* (7th Cir. 1982), 695 F.2d 261, *cert. denied* (1983), 464 U.S. 863, 78 L. Ed. 2d 170, 104 S. Ct. 194.) In that decision the Federal court also concluded that the ordinance was permissible under the Illinois Constitution. (695 F.2d 261, 265-69.) This appeal calls upon this court to determine the meaning of our State constitution by defining the scope of the relevant State constitutional provision, deciding whether the ordinance passes muster under it, and, if so, deciding whether it is permissible under the constitutional home rule power and the police power.

The ordinance (Morton Grove, Ill., Ordinance 81–11 (June 8, 1981)) provides that "[n]o person shall possess, in the Village *** [a]ny handgun, unless the same has been rendered permanently inoperative." It exempts from its operation peace officers, prison officials, members of the armed forces, reserve units and the Illinois National Guard, security guards duly employed by a commercial or industrial enterprise or a public utility, and members of licensed gun clubs who entrust their handguns to the club for safekeeping when not using them for target shooting or other recreational purposes. Antique firearms are also specifically exempted from the ordinance.

Morton Grove residents filed this action seeking an injunction and a declaratory judgment that the ordinance violates article I, section 22, of the Illinois Constitution

and is an unreasonable exercise of the police power. The circuit court of Cook County entered summary judgment in favor of the village, and the appellate court affirmed (113 Ill. App. 3d 488). We granted leave to appeal and permitted various parties to file briefs *amicus curiae* on both sides.

## I. THE CONSTITUTIONAL RIGHT TO ARMS

Article I, section 22, added to the Illinois Constitution in 1970, provides:

> "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." (Ill. Const. 1970, art. I, sec. 22.)

The section does not mirror the second amendment to the Federal Constitution (U.S. Const., amend. II); rather it adds the words "[s]ubject only to the police power," omits prefatory language concerning the importance of a militia, and substitutes "the individual citizen" for "the people." The majority report of the Bill of Rights Committee of the constitutional convention, which framed the provision, makes clear that the latter two changes were intended to broaden the scope of the right to arms from a collective one applicable only to weapons traditionally used by a regulated militia (see *United States v. Miller* (1939), 307 U.S. 174, 83 L. Ed. 1206, 59 S. Ct. 816) to an individual right covering a wider variety of arms. Report of the Bill of Rights Committee on the Preamble and Bill of Rights (hereinafter cited as Committee Report), 6 Record of Proceedings, Sixth Illinois Constitutional Convention (hereinafter cited as Proceedings) 87 (1970).

Equally distinctive, however, is the explicit recognition of "the police power" as a limitation on the liberty the provision affords. The Bill of Rights Committee explained in its report that "[b]ecause arms pose an extraordinary threat to the safety and good order of soci-

ety, the possession and use of arms is subject to an extraordinary degree of control under the police power." (Committee Report, 6 Proceedings 88.) The committee report described, with specific citations, five types of regulatory measures that had been approved in other States as not infringing an individual right to arms, including a complete ban on "certain deadly weapons not commonly and peacefully used by individuals, such as machine guns, firearms equipped with silencing devices, gas-ejecting devices, blackjacks, artillery weapons, bombs, etc." (Committee Report, 6 Proceedings 89) and a total prohibition of "the sale of some weapons in some circumstances" (Committee Report, 6 Proceedings 90, citing *Biffer v. City of Chicago* (1917), 278 Ill. 562, and a Texas case, *Caswell & Smith v. State* (Tex. Civ. App. 1912), 148 S.W. 1159, which approved a confiscatory tax on all sales of pistols).

Plaintiffs contend that section 22 is ambiguous and that the ambiguity can only be resolved to mean that while the State and its subdivisions have the power to regulate the possession and use of weapons which are commonly used for recreation or protection of person and property, such as by requiring that all purchasers of handguns be licensed (see *Biffer v. City of Chicago* (1917), 278 Ill. 562), they may not enact a flat ban on such weapons or any discrete category of them. Plaintiffs also argue that the proper focus in interpreting a constitutional provision such as section 22 must be on the common understanding of the citizens of the State who voted to adopt the Constitution.

The meaning of a constitutional provision depends, of course, on the common understanding of the citizens who, by ratifying the Constitution, gave it life. (*People ex rel. Cosentino v. County of Adams* (1980), 82 Ill. 2d 565, 569; *Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 222.) This understanding, however, is best deter-

mined by referring to the common meaning of the words used. (*Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 464.) The plain language of the provision clearly leaves the right to bear any type of arms subject to the police power. This belies any assertion that a majority of the voters must have interpreted the plain words of the provision as ruling out any specific regulatory measure. The official explanation which all voters received also left considerable leeway for regulation of guns by stating that under section 22 "the right of the citizen to keep and bear arms cannot be infringed, except as the exercise of this right may be regulated by appropriate laws to safeguard the welfare of the community." 7 Proceedings 2689.

The insight offered by these materials is consistent with the interpretation of the provision advanced by the delegates who voted to adopt it. The meaning which the delegates to the convention attached to a provision in the Constitution before sending it to the voters for ratification is relevant in resolving ambiguities which may remain after consulting the language of the provision. (*Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 220; *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 527; see, *e.g., Drury v. County of McLean* (1982), 89 Ill. 2d 417, 422-23.) The reason is that it is only with the consent of the convention that such provisions are submitted to the voters in the first place.

When presented with the report of the Bill of Rights Committee, the delegates to the convention were faced with a choice of adopting the so-called "majority report," which set forth section 22 in substantially the form in which it was enacted; adopting the "minority report," which recommended that the constitution remain silent concerning a right to arms; or adopting the "Lawlor amendment," which read: "The right of the individual to firearms or other means necessary for de-

fense of his person or safeguarding of his property shall not be denied or infringed. The use of deadly weapons for hunting or other sports shall be subject to regulations established by law." (3 Proceedings 1704.) The Lawlor proposal and the minority report were both rejected. The majority report, which was accepted by the convention, was introduced by Delegate Leonard Foster, who stated:

> "[I]t was urged on us that the right to keep and bear *some form of firearm* should be put into the constitution. \*\*\* [W]e added a qualifier that the right to bear arms would be subject *only to the police power of the state* \*\*\*.
>
> In general, the committee feels that the state has the right \*\*\* to regulate firearms; that is to say, to determine who can have them and under what circumstances \*\*\*. [W]e feel that *under this provision, the state would have the right to prohibit some classes of firearms, such as* war weapons, *handguns,* or some other category." (Emphasis added.) 3 Proceedings 1687 (statement of Delegate Foster).

In the debate following the opening statements, Mr. Foster was questioned as follows by Delegate Elmer Gertz:

> "MR. GERTZ: \*\*\* [U]nder [the] provision, would it be possible for the city or the state to ban all hand guns, except those in the hands of police officers?
>
> MR. FOSTER: It would be possible to ban all hand guns, *including* those in the hands of police officers." (Emphasis in original.) (3 Proceedings 1689.)

This response was amplified the following day when, in his introduction of the minority report, Mr. Gertz asserted that "[i]t was admitted yesterday, that the [majority report] would prevent a complete ban of hand guns, for example," and Mr. Foster interjected, "[T]hat is inaccurate. The statement of the majority was that it would prevent a complete ban on all guns, but there could be a

ban on certain categories." (3 Proceedings 1693.) In addition, Delegate Matthew Hutmacher, who, along with Delegate Foster, presented the majority report stated that the scope of the police power under the right-to-arms provision was coextensive with "due process" (3 Proceedings 1689 (statement of Delegate Hutmacher)). Shortly before the vote which rejected the minority report, Mr. Foster stated:

"It is the position of the majority that *under the police power of the state, the legislature would have the authority, for example, to forbid all hand guns.* \*\*\* [I]t is still the position of the majority that, short of an absolute and complete ban on the possession of *all firearms,* this provision would leave the legislature free to regulate the use of firearms in Illinois." (Emphasis added.) 3 Proceedings 1718 (statement of Delegate Foster).

During the course of the debates, several delegates who later voted in favor of the majority report voiced an understanding of the report that was similar to Mr. Foster's. For example, one delegate observed that "as everyone has said— \*\*\* hand guns are by far and away the problem in this country and in this state \*\*\*. This [section] does not in any way attempt or intend \*\*\* [to] restrict the state or the county or the city or any other government within our confines of a reasonable \*\*\* control over hand guns. And I submit to you that *that would include the prohibition* \*\*\*." (Emphasis added.) (3 Proceedings 1717-18 (statement of Delegate Durr).) Another suggested that, far from obstructing State or local legislation aimed at controlling firearms, the majority report gave constitutional sanction to such legislation for the first time. (3 Proceedings 1709-10 (statement of Delegate Elward).) Others stated that, as they understood it, the majority report was a safeguard against the confiscation of all firearms and nothing more. (3 Proceedings 1711 (statement of Delegate Kelleghan), 1712

(statement of Delegate Downen).) Other delegates simply accepted Mr. Foster's understanding of the extent to which the majority report would permit regulation of guns. 3 Proceedings 1711 (statement of Delegate Kelleghan), 1719 (statements of Delegates Daley and Kamin).

Conspicuously absent from the debates is any expression by any delegate who favored the majority report that handguns could not be banned under the majority proposal. The only suggestions of this kind were made by delegates who opposed the majority report, and were offered only to demonstrate the possibility that voters or the courts might interpret the right bestowed by section 22 too expansively in favor of the right to arms. (See 3 Proceedings 1694 (statement of Delegate Weisberg), 1710 (statement of Delegate Fay), 1714 (statement of Delegate Ladd).) The plaintiffs argue that these statements show that there was no common understanding among the delegates who voted on the section. However, "the court is not justified in relying upon arguments against a proposed constitutional amendment 'as seen by the minority,' to determine its meaning after adoption. A precedent so holding would be mischievous in the opportunity it would afford a minority to frustrate the purpose of the [constitutional convention] and the voters." *Hanley v. Kusper* (1975), 61 Ill. 2d 452, 460.

Plaintiffs contend that the natural interpretation of the words "police power," and that which the voters must have had in mind when considering section 22 under which all classes of firearms rather than merely military ones are protected, includes regulation of such firearms but not a prohibition of any class of arms. We see no basis for this argument. This court has long recognized that the police power comprehends laws "restraining or prohibiting anything harmful to the welfare of the people" (*People v. Warren* (1957), 11 Ill. 2d 420, 425; see

*Acme Specialties Corp. v. Bibb* (1958), 13 Ill. 2d 516, 518-19, *cert. denied* (1958), 358 U.S. 840, 3 L. Ed. 2d 74, 79 S. Ct. 64 (ban on sale of sparklers upheld as a proper exercise of the police power)), and no convincing evidence has been produced that the voters ascribed a different meaning to the term in the context of section 22.

The plaintiffs refer to newspaper articles and editorials which they argue led voters to believe that no class of weapons would be subject to complete prohibition (*e.g., Con-Con Questions, Answers,* Illinois State Register, Dec. 10, 1970, at 2, col. 2; *Con-Con unit tested— votes conservative,* Chicago Daily News, Feb. 27, 1970 (State ed.), at 11, col. 1; Editorial, *The sickening rise in gun killings,* Chicago Sun-Times, June 11, 1970, at 71, col. 1; Editorial, *A document in democracy,* Chicago Sun-Times, June 7, 1970, sec. 2, at 11, col. 1; *Editorial, Con-con under the gun,* Chicago Sun-Times, Mar. 4, 1970, at 35, col. 1; Editorial, *Wrong decision on guns,* Chicago Daily News, Feb. 27, 1970 (evening ed.), at 14, col. 1; Editorial, *Gun play at con con,* Chicago Daily News, Feb. 24, 1970 (evening ed.), at 10, col. 1). These articles either expressed the general fear that the provision as debated and passed by the convention would nullify existing gun-control laws and prevent the passage of new ones or reported similar expressions of fear by convention delegates who had opposed the provision.

Consistent with *Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 224-25, we recognize that it may not be improper to ascertain the common understanding of a constitutional provision by reference to news reports. (See *Wolfson v. Avery* (1955), 6 Ill. 2d 78, 89-92.) In this case, however, to support the plaintiffs' position on the basis of the materials offered in evidence would be neither fair nor accurate. With one exception, the relevant articles and editorials cited to us were contained in

the Chicago Daily News and the Chicago Sun-Times. These were published in the same city and had several competitors in their home market. No evidence has been introduced as to the interpretation which newspapers in other parts of the State placed on the right-to-arms provision or the debates which produced it, nor are we told of the understanding communicated by the other newspapers or magazines which Chicago area residents who voted might have read. We are not aware of how many voters read the publications cited, how many of those read the particular articles in question, or how and to what extent those who did read the articles were influenced by them. By contrast, the text of the right-to-arms provision and the official explanation were made available to everyone who voted. Their import was that regulation consistent with the public welfare would be permitted; they did not suggest that such regulation would not include bans on discrete categories of weapons. For these reasons, we conclude that in this case, because of their inconclusive character, the newspaper articles on which the plaintiffs rely should not change our decision.

Based on the floor debates and the official explanation, as well as on the language of the provision, it is apparent to us that section 22, as submitted to the voters, meant that a ban on all firearms that an individual citizen might use would not be permissible, but a ban on discrete categories of firearms, such as handguns, would be. Convincing indications that the voters ascribed a different meaning to the provision not having been offered by the plaintiffs, we conclude, along with the Federal courts (*Quilici v. Village of Morton Grove* (7th Cir. 1982), 695 F.2d 261, *cert. denied* (1983), 464 U.S. 863, 78 L. Ed. 2d 170, 104 S. Ct. 194), that a reasonable prohibition of handguns is constitutional in this State.

Plaintiffs point out that handguns are a form of weapon commonly used for defense of person and prop-

erty and, consequently, they fall within the general protection of section 22. They argue that there is no principle which permits the complete abridgment of one form of constitutionally protected behavior whenever other forms of behavior which enjoy the same form of protection and lead to a substantially similar end are permitted. However, the authorities which plaintiffs cite for this proposition (*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976), 425 U.S. 748, 757-58 n.15, 48 L. Ed. 2d 346, 355-56 n.15, 96 S. Ct. 1817, 1823 n.15; *New York Public Interest Research Group, Inc. v. Village of Roslyn Estates* (E.D.N.Y. 1979), 498 F. Supp. 922, 932) arose in the context of the first amendment. Unlike that amendment, which is designed to encourage the propagation and dissemination of views and ideas (*Village of Schaumburg v. Citizens for a Better Environment* (1980), 444 U.S. 620, 632, 63 L. Ed. 2d 73, 84, 100 S. Ct. 826, 833-34; *Hynes v. Mayor of Oradell* (1976), 425 U.S. 610, 620, 48 L. Ed. 2d 243, 253, 96 S. Ct. 1755, 1760; *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 611-12, 37 L. Ed. 2d 830, 839-40, 93 S. Ct. 2908, 2915) and depends to a large extent on the availability of a variety of forms of expression (*e.g., Metromedia, Inc. v. City of San Diego* (1981), 453 U.S. 490, 500-03 & n.8, 69 L. Ed. 2d 800, 810-12 & n.8, 101 S. Ct. 2882, 2889-90 & n.8), the amendment with which we are dealing was designed neither to encourage nor to discourage the possession of firearms, but merely to guard against the confiscation of all such arms.

Nor do we find merit in plaintiffs' argument that section 22 is a nullity if construed to permit a ban on some of the very categories of weapons it was enacted to protect. We emphasize again that section 22 bestows upon individual citizens for the first time a right to possess some form of weapon suitable for self-defense or recrea-

tion, regardless of the adaptability of the weapon for use in an organized militia or of whether it is possessed for the purposes of forming a militia. The enactment of such a provision can scarcely be regarded as an idle gesture.

## II. THE PROPRIETY OF THE ORDINANCE UNDER THE HOME RULE POWER

Plaintiffs argue that the regulation of firearms is inherently a matter of exclusive statewide concern because of the mobility of guns and gun owners, and that it is thus beyond the power of local governments acting under color of their home rule power (Ill. Const. 1970, art. VII, sec. 6) to enact an ordinance banning handguns. They observe that it is conceivable that one home rule unit within the State may forbid some form of weapon which another home rule unit affirmatively requires (see Goreville, Ill., Ordinance 82—2 (Dec. 7, 1982) and Pittsburg, Ill., Ordinance 83—3 (June 6, 1983) (requiring all resident heads of households, with certain enumerated exceptions, to own a firearm with ammunition)), that one whose possession of a handgun on his person is legal under the laws of his home town and the State would be severely inconvenienced and precluded from traveling via Morton Grove if possession of handguns by all persons within that village were unlawful (Morton Grove, Ill., Ordinance 81—11, sec. 2(B) (June 8, 1981)), and that in any event a handgun ban that applies only to one community without affecting others in the vicinity would do nothing to reduce the incidence of crimes committed with handguns within the affected community and might in fact attract armed criminals to the community from others nearby where handguns are readily available. *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, 5-6; see *Doe v. City and County of San Francisco* (1982), 136 Cal. App. 3d 509, 186 Cal. Rptr. 380 (holding a municipal ordinance banning hand-

guns to be preempted by State law).

Article VII, section 6, of our constitution provides in relevant part:

"(a) *** Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; ***

* * *

(i) Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." (Ill. Const. 1970, art. VII, sec. 6.)

The limitation "pertaining to its government and affairs" has been interpreted to mean that " '*** the powers of home-rule units relate to their own problems, not to those of the state or the nation.' " *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, 5.

Whether a particular problem is of statewide rather than local dimension must be decided not on the basis of a specific formula or listing set forth in the Constitution but with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it. (*Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 539-41; see Report of the Committee on Local Government, 7 Proceedings 1621-22, 1652-57.) The committee which proposed the home rule provision to the constitutional convention gave examples in its majority report of regulations that do not pertain to local government and affairs, together with reasons the subject of the regulations was statewide in scope. Among such examples

were ceilings on billing rates for local telephone calls or interest rates on mortgage loans made within the city or county because State or Federal regulation of utility rates and credit institutions was so extensive and long standing and the interest in uniform regulation so strong as to render those functions nonlocal in character, despite the primarily local impact of the specific ordinances in question. 7 Proceedings 1652; see *People ex rel. Lignoul v. City of Chicago* (1977), 67 Ill. 2d 480.

The plaintiffs seek to apply a free-wheeling preemption rule to the exercise of home rule power. They argue in effect that a subject is preempted whenever it is of significant concern to the State or whenever a uniform statewide solution to the problems it entails might arguably be more manageable than individual control by local units of government. Home rule, however, is predicated on the assumption that problems in which local governments have a legitimate and substantial interest should be open to local solution and reasonable experimentation to meet local needs, free from veto by voters and elected representatives of other parts of the State who might disagree with the particular approach advanced by the representatives of the locality involved or fail to appreciate the local perception of the problem. (See Report of the Committee on Local Government, 7 Proceedings 1605-11; *City of Evanston v. Create, Inc.* (1981), 85 Ill. 2d 101, 107; *Kanellos v. County of Cook* (1972), 53 Ill. 2d 161, 166; Baum, *A Tentative Survey of Illinois Home Rule (Part I): Powers and Limitations,* 1972 U. Ill. L.F. 137, 154-56.) To give home rule the latitude it requires, the court held in *City of Evanston v. Create, Inc.* that a city's substantial interest in regulating relations between landlord and tenant permitted the passage of an ordinance restricting landlords' rights in residential leases to a greater extent than a State statute on the subject, in the absence of any indication in the statute of an intent

that State control of the field be exclusive or of any effect on residential leases outside the city as a result of the ordinance. This court has upheld the right of local governments to enact their own solutions to various other problems of local concern in the face of less stringent or conflicting State regulation, following a determination that the State's expression of interest in the subject as evidenced by its statutory scheme did not amount to an express attempt to declare the subject one requiring exclusive State control. (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494 (county zoning ordinance restricting use of land for sanitary landfill purposes); *Stryker v. Village of Oak Park* (1976), 62 Ill. 2d 523 (ordinance specifying the composition of village's board of fire and police commissioners); *Peters v. City of Springfield* (1974), 57 Ill. 2d 142 (ordinance reducing mandatory retirement age for policemen and firemen below that specified by a State statute); *Mulligan v. Dunne* (1975), 61 Ill. 2d 544, *cert. denied* (1976), 425 U.S. 916, 47 L. Ed. 2d 768, 96 S. Ct. 1518 (county tax on retail sale of liquor).) These holdings follow the mandate of section 6(i) of the local government article of the Constitution that home rule units may exercise home rule powers concurrently with the State until the General Assembly "specifically" limits such exercise or declares the State's exercise to be exclusive. (Ill. Const. 1970, art. VII, sec. 6(i).) They also are consistent with sections 6(g) and 6(h) of that article (Ill. Const. 1970, art. VII, secs. 6(g), (h)), which provide the exclusive methods by which the legislature may preempt a home rule power.

Although plaintiffs contend that weapons control and crime prevention are matters of statewide rather than local concern, villages such as Morton Grove have an obvious interest not only in reducing premeditated crime within their boundaries but also in minimizing the effects of domestic violence or spontaneous quarrels. They also

have an interest in reducing the possibility of serious accidents resulting from the accessibility to children of attractive but dangerous instrumentalities such as handguns. Moreover, the delegates to the constitutional convention acknowledged that weapons control was a field suitable for local regulation pursuant to home rule authority. After the right-to-arms provision emerged from the Bill of Rights Committee prefaced by the words "[s]ubject *** to the police powers *of the State*" (emphasis added) (Report of the Bill of Rights Committee on the Preamble and Bill of Rights, 6 Proceedings 84), the words "of the State" were stricken by vote of the full convention following an objection that their presence might be construed to rule out the exercise of police powers by municipalities and other units of local government. 3 Proceedings 1702-03.

This case does not involve local regulation of a State institution such as the court system (*Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537) or a regional institution such as a sanitary district (*Metropolitan Sanitary District v. City of Des Plaines* (1976), 63 Ill. 2d 256). Nor does it involve regulation of conduct outside the village of Morton Grove, as in *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, except insofar as it may incidentally cause people who wish to carry a handgun while traveling to route themselves through other communities rather than Morton Grove. We do not view this as a reason to hold that weapons control does not pertain to local government or affairs, any more than the possibility that a village speed regulation might cause people who wish to go faster to route themselves around the village invalidates local speed laws. Nor would the possibility that different home rule units might adopt contradictory handgun laws be of concern in this regard. The grant of home rule powers contemplates that different communities which perceive a problem dif-

ferently may adopt different measures to address the problem, provided that the legislature has taken no affirmative steps to circumscribe the measures that may be taken and that the measures taken are reasonable.

Plaintiffs finally contend that the enactment by the State of statutes bearing on gun ownership, possession and sale evidence an intent to preempt the field of firearms regulation either expressly or by implication, and leave no room for local laws regulating or restricting possession of firearms. The statutes to which plaintiffs refer are article 24 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 24—1 *et seq.*) and "An Act relating to the acquisition, possession and transfer of firearms and firearm ammunition ***" (the Firearms and Ammunition Act) (Ill. Rev. Stat. 1981, ch. 38, par. 83—1 *et seq.*). The former is a criminal statute which makes it unlawful to possess certain specified weapons, including pistols and revolvers, on one's person "except when on his land or in his own abode or fixed place of business" (Ill. Rev. Stat. 1981, ch. 38, pars. 24—1(4), (10)) and subject to certain other exceptions. In addition, it provides that any possession of firearms or firearm ammunition by convicted felons, narcotics addicts, recent mental hospital patients, and certain other narrowly defined classes of people is illegal. (Ill. Rev. Stat. 1981, ch. 38, par. 24—3.1.) The Firearms and Ammunition Act, enacted "to provide a system of identifying persons who are not qualified to acquire or possess firearms and firearm ammunition within the State of Illinois" (Ill. Rev. Stat. 1981, ch. 38, par. 83—1), requires all firearm owners to obtain an identification card from the Department of Law Enforcement and makes it illegal for anyone to sell or transfer a firearm or ammunition to a person who does not display a card. It gives the Department of Law Enforcement the authority to deny cards "only" to specified classes of people, including those who are narcotics

addicts or mentally retarded, convicted felons, and persons under age 21 who have been convicted of misdemeanors or adjudged delinquent or who do not have the written consent of their parents or guardian to possess firearms or ammunition. Ill. Rev. Stat. 1981, ch. 38, par. 83—8.

Neither of these statutes suggests that firearms control is a subject for exclusive State involvement. In fact, the only statement in either act concerning the permissibility of more stringent local control is to the opposite effect: "The provisions of any ordinance enacted by any municipality which requires registration or imposes greater restrictions or limitations on the acquisition, possession and transfer of firearms than are imposed by this Act, are not invalidated or affected by this Act." (Ill. Rev. Stat. 1981, ch. 38, par. 83—13.1.) This provision, in the Firearms and Ammunition Act, refutes any contention that the use of the word "only" in section 8 of that act (Ill. Rev. Stat. 1981, ch. 38, par. 83—8) was intended to declare that all persons not mentioned in that section are qualified to possess firearms notwithstanding municipal regulations to the contrary. This case is therefore distinguishable from *Doe v. City and County of San Francisco* (1982), 136 Cal. App. 3d 509, 186 Cal. Rptr. 380, in which a California statute otherwise similar to the two statutes we are considering affirmatively provided that persons who were not covered by its restrictions were entitled to possess firearms without a license or permit.

We likewise find no basis for concluding that the two acts on which plaintiffs rely leave no room for more restrictive local laws or are contradicted in any way by Morton Grove's ordinance. In passing, we state that we are not impressed by the fact, relied on by plaintiffs, that section 24—3(h) of the Criminal Code of 1961 outlaws the sale or delivery of only those handguns which

melt or deform at less than 800 degrees Fahrenheit (Ill. Rev. Stat. 1981, ch. 38, par. 24—3(h)) and stops short of criminalizing the possession of all pistols and revolvers by all persons. In the absence of any indication that the legislature meant to bestow an affirmative right on all persons in the State not mentioned in the statute to possess handguns that do not melt at 800 degrees, these provisions do not prevent governmental units which would otherwise be able to regulate the possession of firearms from enacting regulations with a broader scope. See *Brown v. City of Chicago* (1969), 42 Ill. 2d 501, 504-05.

Plaintiffs argue that applying for an identification card in compliance with the Firearms and Ammunition Act involves disclosing certain information to State officials which may incriminate the applicant for purposes of prosecution under Morton Grove's ordinance in violation of the fifth and fourteenth amendments (see *Leary v. United States* (1969), 395 U.S. 6, 14-18, 23 L. Ed. 2d 57, 69-71, 89 S. Ct. 1532, 1536-39; *Haynes v. United States* (1968), 390 U.S. 85, 95-97, 19 L. Ed. 2d 923, 931-33, 88 S. Ct. 722, 729-30; *Marchetti v. United States* (1968), 390 U.S. 39, 44-49, 19 L. Ed. 2d 889, 895-98, 88 S. Ct. 697, 700-03), and therefore the ordinance cannot be sustained. In *Haynes v. United States*, a typical holding and the case most readily analogous to the one at bar, a Federal firearms-registration requirement was held to violate the privilege against self-incrimination in conjunction with a Federal statute which outlawed the possession of firearms under substantially the same circumstances as those which gave rise to the obligation to register. By contrast, whereas the Firearms and Ammunition Act requires an identification card of all persons who intend to possess "any firearm or any firearm ammunition within this State" (Ill. Rev. Stat. 1981, ch. 38, par. 83—2), the ordinance with which we are dealing out-

laws only the possession of handguns; permits everyone to possess a handgun that has been rendered permanently inoperative, or which is used solely for recreational purposes within the village and is kept on the premises of licensed gun clubs or outside village boundaries; and permits certain people, including commercial or industrial security guards, to possess operable handguns anywhere within the village. Inasmuch as the application for an identification card under the Firearms and Ammunition Act need not mention the applicant's occupation, the kind of firearm he wishes to possess, the place where he intends to keep it, or the purposes for which he intends to use it (Ill. Rev. Stat. 1981, ch. 38, pars. 83—4, 83—6), the only information Morton Grove authorities could glean from the application is that a resident of Morton Grove desires to possess a firearm. This information by itself would be of virtually no use in establishing a violation of the ordinance.

We therefore conclude that the ordinance is a permissible exercise of Morton Grove's home rule powers.

### III.  THE PROPRIETY OF THE ORDINANCE AS AN EXERCISE OF THE POLICE POWER

Plaintiffs contend that, inasmuch as guns and gun owners are highly mobile, the ordinance in question is valueless in preventing crime within the village of Morton Grove and may in fact encourage it by disarming law-abiding citizens. They argue that the ordinance is perverse as a safety measure and violates Federal and State guarantees of due process (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, sec. 2). In related contentions, they argue that the ordinance, through its exemptions, arbitrarily discriminates between residents of the village in violation of equal protection guarantees, and that because of the fundamental nature of the right to bear arms in self-defense the ordinance is overbroad for

purposes of due process and equal protection in that its substantive goals can be accomplished through various less restrictive means.

Initially we observe that the search for less onerous alternative means of securing a governmental interest is a hallmark of strict scrutiny, which comes into play only when a fundamental right is invaded. Not every right secured by the State or Federal constitutions is fundamental, however, but only those which "lie at the heart of the relationship between the individual and a republican form of nationally integrated government" (*People ex rel. Tucker v. Kotsos* (1977), 68 Ill. 2d 88, 97). While the right to possess firearms for purposes of self-defense may be necessary to protect important personal liberties from encroachment by other individuals, it does not lie at the heart of the relationship between individuals and their government. The right to arms guaranteed by the Federal Constitution has never been thought to be an individual right, as distinguished from a collective right (*United States v. Miller* (1939), 307 U.S. 174, 83 L. Ed. 1206, 59 S. Ct. 816); moreover, the right to arms secured by the Illinois Constitution, which did not exist prior to 1970, is subject, as we have explained, to substantial infringement in the exercise of the police power even though it operates on the individual level. See *Rawlings v. Department of Law Enforcement* (1979), 73 Ill. App. 3d 267, 274-75.

Under the rational-basis test, which is the appropriate level of scrutiny when no fundamental right is involved, the relevant inquiry for purposes of due process and equal protection is whether the Morton Grove ordinance bears a rational relationship to a legitimate governmental interest, not whether it is overly broad. (*Lindsey v. Normet* (1972), 405 U.S. 56, 70, 31 L. Ed. 2d 36, 48, 92 S. Ct. 862, 872; see *Hayen v. County of Ogle* (1984), 101 Ill. 2d 413, 421; *Illinois Housing Development Authority*

*v. Van Meter* (1980), 82 Ill. 2d 116, 120.) In this regard the ordinance in its preamble defines the village's interest as reducing "the potentiality of firearm related deaths and injuries" caused by "the easy and convenient availability of certain types of firearms and weapons" and finds that "handguns play a major role in the commission of homicide, aggravated assault, and armed robbery, and accidental injury and death." (Morton Grove, Ill., Ordinance 81—11 (June 8, 1981).) Because of the ease with which handguns can be concealed and handled, as compared with other types of weapons, a ban on handguns under the conditions set forth in the ordinance could rationally have been viewed by the village as a way of reducing the frequency of premeditated violent attacks as well as unplanned criminal shootings in the heat of passion or in overreaction to fears of assault, accidental shootings by children or by adults who are unaware that a handgun is loaded, or suicides. We find of no significance the possibility that the ordinance was passed for the sole purpose of publicizing a political viewpoint, as the plaintiffs contend is demonstrated by the transcribed statements of the village trustees who approved the ordinance: police regulations and statutory classifications will be upheld "if any state of facts reasonably may be conceived to justify" them. *McGowan v. Maryland* (1961), 366 U.S. 420, 426, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101, 1105; *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 122.

For similar reasons, we find no constitutional infirmity in the fact that the ordinance permits security guards or special agents employed by railroads or public utilities to carry handguns regardless of their actual qualifications to possess or handle firearms without endangering the public, whereas ordinary citizens are not permitted to do so regardless of their qualifications or the urgency of their need to carry a gun. The village

trustees could validly have believed that security guards as a group were likely to exercise greater responsibility in using their weapons than citizens generally, or it may simply have concluded that the private interest in protecting commercial premises was greater than the public interest in banning handgun possession in those few cases covered by the exemption of which plaintiffs complain. Because we cannot say that the classification is unrelated to the goals of the ordinance, we hold that it is a proper exercise of the police power.

Plaintiffs, noting that the case was dismissed upon the entry of summary judgment by the circuit court, urge us to remand the cause to that court for consideration of additional evidence that may have a bearing on the rationality of the ordinance. Our review, however, is not one of fact but purely one of law, and our conclusion is compelled by the judgment that the ordinance bears a rational relation to the goal of reducing weapons-related injuries and accidents within the village of Morton Grove. Minimal scrutiny requires nothing more, and we do not perceive how a remand might alter this judgment. For the reasons stated, therefore, we conclude that the ordinance is a proper exercise of the police power authority.

The judgments of the appellate and circuit courts are affirmed.

*Judgments affirmed.*

CHIEF JUSTICE RYAN, dissenting:

I join in the very convincing dissent of my colleague, Justice Moran. In addition, I wish to address the question of the use of police power by the village of Morton Grove to ban the ownership of handguns.

The majority opinion concedes that section 22 of article I of our Illinois Constitution broadened the scope of the right to arms from the limited collective right of the

Federal Constitution to an individual right covering a wider variety of arms and that the Illinois Constitution bestows upon individual citizens the right to possess weapons suitable for self-defense and recreation. This constitutionally granted right is subject only to regulation through the use of the police power.

This court, in *Nahser v. City of Chicago* (1915), 271 Ill. 288, 291-92, addressed what constitutes a legitimate use of the police power by stating:

"Under what circumstances or conditions the police power of the State may be exercised was defined in *City of Chicago v. Netcher*, 183 Ill. 104, as follows: 'In order to sustain legislative interference with the business of the citizen by virtue of the police power it is necessary that the act should have some reasonable relation to the subjects included in such power. If it is claimed that the statute or ordinance is referable to the police power, the court must be able to see that it tends in some degree towards the prevention of offenses or the preservation of the public health, morals, safety or welfare. It must be apparent that some such end is the one actually intended and that there is some connection between the provisions of the law and such purpose. If it is manifest that the statute or ordinance has no such object, but, under the guise of a police regulation, is an invasion of the property rights of the individual, it is the duty of the court to declare it void.' "

The majority uses equal protection standards relating to statutory classification to support its statement that police regulations will be upheld if any state of facts may be reasonably conceived to justify them, citing *McGowan v. Maryland* (1961), 366 U.S. 420, 426, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101, 1105, and *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 122. Both of these cases involved equal protection questions, and the language relied on relates to statutory discrimination through classification.

I am not concerned with an equal protection question. We are here dealing with a due process question: the taking away of a constitutionally given right—the right to arms—through the exercise of the police power. The language of this court in *Nahser* quoted above specifies under what circumstances the police power may be exercised. That language is supplemented by the holding of this court in *Klein v. Department of Registration & Education* (1952), 412 Ill. 75, where, after finding that the right to engage in a legitimate trade, occupation, business or profession is embraced within the constitutional guarantees of liberty and the pursuit of happiness, the court stated:

"The right to pursue a trade or calling is, however, subordinate to the right of the State to limit such freedom of action where the public health, safety or welfare may require. [Citations.] In instances where the police power is invoked to regulate and supervise a legitimate occupation, the restraint imposed must be reasonable. The legislative determination that regulations are needful is not conclusive and is always subject to review. In order for such regulations to be lawfully imposed upon the constitutional rights of the individual to pursue his trade, profession or business, the act passed under the guise of a measure to protect the public health, safety and welfare must have a definite relation to the ends sought to be attained." *Klein v. Department of Registration & Education* (1952), 412 Ill. 75, 78-79.

This court's inquiry in reviewing the legislative exercise of the police power should be whether the legislation represents a rational means to accomplish a proper purpose. (*Pozner v. Mauck* (1978), 73 Ill. 2d 250, 255.) Thus, the inquiry must be: First, what purpose does the legislative body seek to accomplish by depriving the residents of Morton Grove of the constitutionally given right to arms? Second, is it a *proper* purpose; that is, one that may be constitutionally achieved by the use of the police

power? Lastly, does the ordinance use a rational means of accomplishing the purpose? As noted in the language quoted from *Klein*, in order for such a regulation to be lawfully imposed on a constitutional right of an individual, the act passed under the guise of a measure to protect the public health, safety and welfare must have a definite relation to the ends sought to be attained.

As the majority opinion notes, the ordinance, in its preamble, cites certain interests of the village, such as reducing "the potentiality of firearm related deaths and injuries" caused by "the easy and convenient availability of certain types of firearms and weapons," and finds that "handguns play a major role in the commission of homicide, aggravated assault, and armed robbery, and accidental injury and death."

Although the recited purposes of the ordinance would appear to be laudable and supportive of the exercise of the police power to achieve these ends, the minutes of the meeting of the board of trustees of the village at which the ordinance was adopted do not reflect any discussion of these purposes, or that the ordinance was adopted to achieve them. There was no discussion as to how many, if any, deaths, injuries or crimes involving handguns had been committed in Morton Grove. In this litigation, at the trial level, an affidavit of the chief of police was presented that showed that over a 24-year period there had been a total of 155 incidents of handgun misuse in the village, or an average of about six incidents a year. The statistics presented reveal that the incidents had declined since the late 1970's. The statistics compiled by the chief of police did not disclose the nature of the handgun misuse, or whether the misuse involved a crime, death or injury. Also, the statistics did not disclose if the misuses were committed by residents of Morton Grove. Meager as these statistics are, they reveal that the misuse of handguns is a very minimal prob-

lem in Morton Grove.

The purposes of the ordinance cited in its preamble were therefore pure and simple litany, inserted in the ordinance for window dressing and to help withstand constitutional challenge. Since no discussion was had at the meeting of the village board concerning handgun misuse in the village, and since these statistics concerning such misuse were not compiled until after the ordinance was adopted and were not presented to the village board, it is apparent that some other purpose motivated the adoption of the ordinance. This purpose is disclosed by the minutes of the meeting at which the ordinance was adopted by a vote of four to two. Before voting, the trustees expressed their opinions on the ordinance. As recorded in the minutes, those voting in favor of the ordinance stated:

> "*Trustee Cashman* — hoped the legislation would work as a catalyst for other communities to adopt similar handgun restrictions."

> "*Trustee Greenberg* — stated that he was elected to be a leader and if they do not like what I do, they have the right to vote me out."

> "*Trustee Sneider* — hoped that the Ordinance would send a message to other legislative bodies across the country."

> "*Trustee Youstra* — said he was an owner of hand guns but felt that the Supreme Court had ducked the issue long enough and felt it should be up to them to decide one way or the other."

The majority opinion acknowledges that these statements reflect the possibility that the ordinance was passed for the sole purpose of publicizing a political viewpoint. I am in accord with that conclusion. I am shocked, however, that the majority opinion finds no significance in this possibility. If the police power can be exercised for the sole purpose of publicizing a political

viewpoint, then I feel that our constitutionally guaranteed rights are in serious jeopardy.

As stated in the language quoted above from *Nahser*, it must be apparent that the legislation tends in some degree toward the prevention of offenses, or the preservation of public health, morals, safety or welfare; that such an end is the one *actually intended*; and that there is some connection between the ordinance and such purpose. If it is manifest that the legislation *has no such object*, but under the guise of a police regulation is an invasion of the property rights of the individual, it is the duty of the court to declare it void. *Nahser v. City of Chicago* (1916), 271 Ill. 288, 292.

We are not compelled to blindly follow the incantations of a legislative body inserted in legislative enactments to lend an aura of validity to the act. In *Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, this court had before it the Chicago service-tax ordinance, which recited that the tax was imposed upon the purchaser of services. It was asserted by the city that, because of this provision, the tax was not an occupational tax which, under the Constitution, the city could not impose without legislative authorization. We stated that this court must determine whether a simple declaration that a tax is imposed upon the purchaser of services is sufficient to avoid the restrictions imposed by the Constitution against the imposition of a tax on occupations. (*Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, 65.) We noted in that case that this court had stated in *Winter v. Barrett* (1933), 352 Ill. 441, 459, that the legislature has no power to declare that not to be a fact which everyone knows is a fact. (*Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, 65.) In *Commercial National Bank*, we further stated:

> "The mere recitation in the ordinance that the tax is upon purchasers of services does not eliminate the evils

the delegates to the convention sought to prevent.

Obviously, the city of Chicago was aware of the 'legal incidence' language previously used by this court and attempted to tailor its ordinance to incorporate a sufficient amount of such language—'magic words'—to transform an occupation tax into a tax upon the purchaser." *Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, 67.

This court further stated:

"If we permit this restriction to be nullified by simply inserting a few words in an ordinance, which ostensibly imposes the legal incidence of a tax upon the purchaser while the ordinance as a whole places responsibilities and penalties for the tax upon the seller of services, we will have effectively repealed, or deleted from our constitution, the requirement that authorization by the General Assembly must be given before a home rule unit may impose taxes upon occupations." *Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, 68.

The same rationale must apply to this case. If we permit the constitutionally given right to arms to be nullified by simply inserting a few "magic words" in an ordinance which gives the ordinance an appearance of being a valid exercise of the police power, when it is in fact only the assertion of a political philosophy and a publicizing of that viewpoint, then we have in effect eliminated this right that has been granted by the Constitution.

This court, on another occasion, has examined the impingement of the police power on constitutional rights of individuals and found the basis of the ordinance lacking. In *City of Chicago v. Wilson* (1978), 75 Ill. 2d 525, this court considered the validity of an ordinance which made it an offense for any person to appear in a public place in a dress not belonging to his or her sex with intent to conceal his or her sex. The two defendants were male and were arrested after they emerged from a restaurant dressed as females. The defendants testified at trial that

they were transsexuals and challenged the ordinance as denying them their constitutional rights. This court held the ordinance unconstitutional, stating:

"Even though one's choice of appearance is not considered a 'fundamental' right [citation], the State is not relieved from showing some justification for its intrusion. *** It is, therefore, incumbent upon the court to analyze both the circumstances under which the right is asserted and the reasons which the State offers for its intrusion.

In this court, the city has asserted four reasons for the total ban against cross-dressing in public: (1) to protect citizens from being mislead or defrauded; (2) to aid in the description and detection of criminals; (3) to prevent crimes in washrooms; (4) to prevent inherently antisocial conduct which is contrary to the accepted norms of our society. The record, however, contains no evidence to support these reasons.

If we assume that the ordinance is, in part, directed toward curbing criminal activity, the city has failed to demonstrate any justification for infringing upon the defendants' choice of public dress under the circumstances of this case." *City of Chicago v. Wilson* (1978), 75 Ill. 2d 525, 532-33.

This court further stated in conclusion:

"Inasmuch as the city has offered no evidence to substantiate its reasons for infringing on the defendants' choice of dress under the circumstances of this case, we do not find the ordinance invalid on its face; however, we do find that section 192—8 as applied to the defendants is an unconstitutional infringement of their liberty interest." *City of Chicago v. Wilson* (1978), 75 Ill. 2d 525, 534.

Thus, it is not sufficient when considering constitutional rights that there be a bare assertion or recital of a proper purpose for the exercise of the police power. As held in *City of Chicago v. Wilson*, there must be some valid existing reason for the intrusion. In summary, it is my position that although the ordinance recites an accepted purpose for the exercise of the police power, we

must not accept such a recitation without question. In looking behind the ordinance under consideration, the village has not shown a need or justification for the infringement on the constitutional right to arms. The sole purpose behind the ordinance was to assert and publicize a particular political belief, "to send a message to other legislative bodies across the country." Such a purpose is not a sufficient reason for infringing on a constitutional right by the exercise of the police power. I therefore dissent.

UNDERWOOD and MORAN, JJ., join in this dissent.

JUSTICE MORAN, also dissenting:

For more than a decade, the bill of rights to the Illinois Constitution has included a provision on the right to keep and bear arms (Ill. Const. 1970, art. I, sec. 22). I agree with the majority opinion that the language of section 22 of article I indicates that the right to keep and bear arms is a qualified, not an absolute, right. Nevertheless, I disagree with the conclusion that under section 22 municipalities may enact flat bans on the possession of ordinary handguns. Under the opinion announced today, so long as municipalities allow residents to possess "some form of weapon suitable for self-defense or recreation" municipalities may ban all other weapons. (103 Ill. 2d at 499-500.) The majority's strained reading of section 22 defies logic and runs counter to the history surrounding the enactment of the right-to-bear-arms guarantee.

To the contrary, section 22 prohibits a flat ban on those types of firearms that "law-abiding citizens commonly employ for purposes of recreation or the protection of person and property," including ordinary handguns and long guns. Report of the Bill of Rights Committee on the Preamble and the Bill of Rights (Committee Report), 6 Record of Proceedings, Sixth Illinois

Constitutional Convention (Proceedings) 87.

This court has long adhered to the principle that a constitutional provision must be interpreted in accordance with the intent and understanding of the electorate who ratified the instrument. (*People ex rel. Cosentino v. County of Adams* (1980), 82 Ill. 2d 565, 569; *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 527.) In *Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 222, we stated that "[a]lthough the constitutional debates may often be helpful in understanding the meaning of doubtful constitutional provisions, the true inquiry concerns the understanding of its provisions by the voters who, by their vote, have given life to the product of the convention."

Today's opinion places considerable reliance on the comments of certain delegates to the constitutional convention to justify the conclusion that section 22 does not prohibit municipalities from enacting a flat ban on the possession of ordinary handguns. Although this court on occasion has consulted such debates when the meaning of the constitutional provision was in doubt, it has done so only when it appeared that the delegates reached a consensus as to the meaning of the provision. (*Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 221.) Indeed, the court has approached such debates cautiously, since "[i]t is possible to lift from the constitutional debates on almost any provision statements by a delegate or a few delegates which will support a particular proposition; however, such a discussion by a few does not establish the intent or understanding of the convention." 75 Ill. 2d 208, 221; see also *People ex rel. Cosentino v. County of Adams* (1980), 82 Ill. 2d 565, 569.

After considering the debates on section 22, I am of the opinion that, at most, the debates reflect a lack of consensus as to the meaning of section 22. The debates illustrate that the issue of whether Illinois' citizens

should have the right to bear arms was a highly controversial and emotional issue. (See, *e.g.*, 3 Proceedings 1686 (statement of Delegate A. Lennon); 3 Proceedings 1718 (statement of Delegate Foster).) Some delegates, as the majority opinion points out, believed that, by including the clause "subject only to the police power ***" in section 22, the legislature and municipalities could prohibit the possession of handguns. (3 Proceedings 1687 (statement of Delegate Foster).) Other delegates apparently attributed different meanings to section 22. (See 3 Proceedings 1700 (statement of Delegate Weisberg); 3 Proceedings 1707 (statement of Delegate Hutmacher); 3 Proceedings 1708 (statement of Delegate Friedrich); 3 Proceedings 1719 (statement of Delegate Mullen).) Little more than a handful of the 116 delegates expressed their opinion during the debates concerning the meaning of section 22. Most of the comments concerned the wisdom of gun-control laws. Those delegates who did express an opinion as to the meaning of section 22 often contradicted themselves. For example, Delegate Leonard Foster, a member of the convention's Committee on the Bill of Rights, noted that the legislature, under section 22, could "prohibit some classes of firearms, such as war weapons, handguns, or some other category." (3 Proceedings 1687.) However, Delegate Foster later stated that "[t]he majority does believe that those law-abiding citizens in this state who need and want to have *certain types* of firearms in their possession are entitled to have that as a constitutional right." (Emphasis added.) (3 Proceedings 1718.) In the same speech, Delegate Foster commented that, under section 22, "the legislature might have the authority to forbid *all firearms whatsoever* in Cook County." (Emphasis added.) (3 Proceedings 1718.) The contradictory comments were perhaps attributable to the fact that committee members were attempting to sell section 22 to delegates with diametri-

cally opposed viewpoints on the subject of gun control. See 3 Proceedings 1707 (statement of Delegate Hutmacher).

The lack of consensus as to the meaning of section 22 was not lost on a number of delegates. Delegate William Fay, during the course of the debates, noted that "the fact that we have just seen the last two or three speakers here unite in support of this measure for different reasons indicates how this proposal will mean different things to different people." (3 Proceedings 1710.) Delegate Jeffrey Ladd commented that it "seems we got people together on this bill for different reasons, and maybe we ought to know which side is really going to prevail." (3 Proceedings 1714.) Delegate Jeanette Mullen stated, "Seldom have I heard such contradictory argument as has been presented today by the supporters of the majority [committee] report." (3 Proceedings 1719; see also 3 Proceedings 1713 (statement of Delegate Conner).) I feel the court's reliance, in this instance, on the constitutional debates is misplaced.

On the other hand, the report of the convention's Committee on the Bill of Rights left the understanding that municipalities would be prohibited from enacting total bans on the possession of ordinary handguns. Committee members drafted the proposal which eventually became section 22. The committee report at the time that the 1970 Constitution was ratified stated:

> "By referring to 'the individual citizen' and to the right to 'keep' as well as to 'bear' arms, the proposed new provision guarantees an individual right rather than a collective right and seeks to assure that the 'arms' involved are not limited by the armaments or needs of the state militia or other military body. The substance of the right is that a citizen has the right to possess and make reasonable use of arms that law-abiding persons commonly employ for purposes of recreation or the protection of person and property." (6 Proceedings 87.)

In defining those "arms that law-abiding persons commonly employ," the committee report referred to *People v. Brown* (1931), 253 Mich. 537, 542, 235 N.W. 245, 247, and *State v. Duke* (1875), 42 Tex. 455, 458. Both of these cases clearly show that handguns were intended by the committee to be included within the class of firearms protected by section 22.

The committee report also stated:

> "Laws that attempted to ban all possession or use of such arms [handguns], or laws that subjected possession or use of such arms to regulation or taxes so onerous that all possession or use was effectively banned, would be invalid." (6 Proceedings 87.)

The above-quoted language, I submit, gave the understanding that section 22 prohibits municipalities from enacting total bans on the possession of handguns. This conclusion is further bolstered by the cases referred to in the committee report in support of the proposition that a ban on "all possession or use of such arms" would be unconstitutional under section 22. All of these cases involved attempts to ban, directly or indirectly, the possession of handguns. In each of these cases cited by the committee report, the courts held that the governmental body involved exceeded the police powers, and, thus, that the law violated their respective State constitutional provisions on the right to keep and bear arms. (See *State v. Kerner* (1921), 181 N.C. 574, 107 S.E. 222; *People v. Zerillo* (1922), 219 Mich. 635, 189 N.W. 927; *In re Brickey* (1902), 8 Idaho 597, 70 P. 609.) Nowhere did the committee report indicate that a total ban on handguns would be permissible. The list of permissible regulations contained in the committee reports, along with appropriate case citations, included the prohibition of "certain deadly weapons *not* commonly and peacefully used by individuals." (Emphasis added.) (Committee Report, 6 Proceedings 89.) (See, *e.g., Morrison v. State* (1960), 170

Tex. Crim. 218, 339 S.W.2d 529 (machine gun); *People v. Brown* (1931), 253 Mich. 537, 235 N.W. 245 (blackjack).) The committee report also stated that certain individuals, such as minors, incompetents and convicted felons, could be prohibited from possessing firearms. (Committee Report, 6 Proceedings 89.) Finally, the report indicated that gun licensing and permit laws, as well as taxes on firearms, would continue to be valid under section 22. (See, *e.g.*, *Biffer v. City of Chicago* (1917), 278 Ill. 562 (gun-permit law); *Caswell & Smith v. State* (Tex. Civ. App. 1912), 148 S.W. 1159 (tax on sale of pistols).) None of the regulations cited by the committee involved the total ban on the class of arms that "law-abiding persons commonly employ." Indeed, the report only gave the impression that the committee rejected such a reading of section 22.

Moreover, the Committee on the Bill of Rights and convention delegates specifically declined to adopt proposals which would have allowed the prohibition of ordinary handguns. The committee rejected a proposed amendment that would have added the phrase "except handguns" following the word "arms" to the text of the draft which became section 22. (Minutes of the Committee on the Bill of Rights, March 12, 1970.) Similarly, convention delegates rejected Member Proposal No. 131, which would have prohibited handguns (7 Proceedings 2901), and Member Proposal No. 220, which would have permitted the General Assembly to ban the possession of any firearm (7 Proceedings 2936). If committee members or convention delegates had desired to give municipalities such wide-ranging power, they would not have rejected every proposal authorizing the right to prohibit handguns.

In my opinion, municipalities cannot, consistent with section 22, enact flat bans on the possession of handguns or any other firearm which is commonly used by law-

abiding citizens for recreation or protection of person or property. I would therefore hold that Morton Grove's ordinance banning the possession of handguns is unconstitutional.

In addition, I strongly disagree with the majority's conclusion that Morton Grove has not exceeded its home rule powers in enacting the handgun ban. Article VII, section 6(a), of our constitution provides that a home rule municipality may exercise any power "pertaining to its government and affairs." (Ill. Const. 1970, art. VII, sec. 6(a).) This court has stressed that " 'the powers of home rule units relate to their own problems, not those of the State or nation.' " *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 540.

In *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, the Chicago & North Western Railway Company was found guilty on several counts of violating Des Plaines' antinoise ordinance. This court reversed the convictions, holding that Des Plaines had exceeded its power under article VII, section 6(a), in enacting the ordinance. The court held that noise pollution was a State and not a local concern because noise-pollution problems cannot be confined to the boundaries of one municipality. Local control of noise pollution, as the court explained, could result in the imposition of conflicting and counterproductive standards on persons passing through various neighboring municipalities. 65 Ill. 2d 1, 5.

The problems associated with the use of handguns and other firearms are similarly a subject for State, not local, regulation. Like municipal noise ordinances, municipal handgun ordinances will be conflicting and counterproductive. Municipalities may, consistent with today's opinion, ban the possession of any weapon so long as residents are allowed to possess one type of weapon. Thus, Morton Grove may ban handguns and a neighbor-

ing municipality may ban rifles, shotguns or both. Another neighboring community may decide to require persons to own and possess guns. Indeed, two Illinois municipalities have enacted ordinances purporting to require handgun ownership. (Goreville, Ill., Ordinance 82—2 (Dec. 7, 1982); Pittsburg, Ill., Ordinance 83—3 (June 6, 1983).) As plaintiffs correctly point out, today's opinion will create a "crazy quilt of conflicting and unenforceable home rule ordinances." *Quilici v. Village of Morton Grove* (7th Cir. 1982), 695 F.2d 261, 276 (Coffey, J., dissenting), *cert. denied* (1983), 464 U.S. 863, 78 L. Ed. 2d 170, 104 S. Ct. 194.

The majority opinion attempts to justify its conclusion that the Morton Grove ordinance is properly local by stating that the ordinance "does [not] involve regulation of conduct outside the village of Morton Grove ***." (Slip op. at 12.) Although the ordinance does not purport to regulate conduct outside Morton Grove, the ordinance will affect nonresidents as well as influence conduct outside the village boundaries. Nonresidents are required by the ordinance to make their handguns "permanently inoperable" before transporting their guns through Morton Grove. (Morton Grove, Ill., Ordinance 81—11 (June 8, 1981).) The ordinance has the practical effect of forcing nonresidents to avoid Morton Grove if they wish to carry their firearms to a neighboring community where handguns are permitted. Secondly, by banning the possession of handguns within its boundaries, Morton Grove has presumably increased the number of handguns that are present in adjacent communities, since the ordinance does not prohibit its residents from storing, selling, or using their handguns outside the village.

Moreover, today's decision fails to adequately consider the potential problems that could result from inconsistent local gun laws. Inconsistent local gun laws could make it difficult for gun owners to lawfully use their

firearms, since gun owners must often travel from one community to another in order to use their firearms lawfully. Those gun owners wishing to use their firearms for hunting, target shooting or other lawful recreational activity could be subject to a wide range of criminal penalties merely because they unknowingly violated one or more local gun-control laws. Furthermore, under the majority's reasoning, there is nothing to prohibit municipalities from enacting gun-control laws that are more permissive than State gun-control laws. If so, these gun-control ordinances would undoubtedly have an effect on nearby communities' law-enforcement efforts.

The issue of whether an Illinois citizen may or may not possess a handgun has never, until today, been thought to be a matter for local governments. The Morton Grove ordinance is the first of its kind. Instead, handguns and other firearms have been subject to extensive regulation by our State government. The Illinois General Assembly enacted the Illinois deadly-weapons statute (Ill. Rev. Stat. 1981, ch. 38, par. 24—1 *et seq.*) and the Firearms and Ammunition Act (Ill. Rev. Stat. 1981, ch. 38, par. 83—1 *et seq.*). The deadly-weapons statute, in particular, is a comprehensive statute which prescribes what types of firearms that may be privately owned, who may own and use such firearms, and where, when and how these firearms may be used. In enacting the deadly-weapons statute, the General Assembly was mindful of the fact that effective gun control requires consistent, orderly and comprehensive legislation. The deadly-weapons statute was adopted with the purpose of creating "one comprehensive, integrated statute, dealing in an orderly manner with deadly weapons," so that State gun-control laws are "consistent with one another." (Ill. Ann. Stat., ch. 38, par. 24—1, Committee Comments, at 83—84 (Smith-Hurd 1977).) The deadly-weapons statute, as the court points out, makes it un-

lawful to possess certain kinds of weapons, including handguns, on one's person "except when on his land or in his own abode or fixed place of business." (Ill. Rev. Stat. 1981, ch. 38, pars. 24—1(4), (10).) The statute also provides for other exemptions. The exemptions were included in the statute because the General Assembly specifically determined that such uses are "justified by the office or position of the user or by the activity for which they are used." Ill. Ann. Stat., ch. 38, par. 24—1, Committee Comments, at 84 (Smith-Hurd 1977).

Although the existence of a State regulatory scheme on a given subject is not determinative of whether the subject is properly State or local, it is considered evidence that the subject is recognized as a matter of statewide concern. (*City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1, 7 (State environmental act is evidence that noise pollution is statewide concern); *cf., Hutchcraft Van Service, Inc. v. City of Urbana* (1982), 104 Ill. App. 3d 817.) Moreover, in *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, the court stated that " '[l]ong standing state regulation' " in a given area could preclude the " 'subject from being considered a matter pertaining to home-rule government and affairs.' " 61 Ill. 2d 537, 541, quoting Report of the Local Government Committee, 7 Proceedings 1652.

In the present case, the State regulation of firearm possession has been long standing, comprehensive and, for the most part, exclusive. Until now, home rule municipalities have not attempted to enact ordinances of the type adopted by Morton Grove. Until now, the issue of whether or not a person may possess a firearm has been resolved by looking to a State regulatory scheme intended by the General Assembly to deal with firearms in an orderly and consistent manner. The Morton Grove ordinance directly conflicts with the express policy of the deadly-weapons statute. Under the Morton Grove ordi-

nance, persons are prohibited from possessing handguns in their home, on their land, or in their "fixed place of business" despite the express authorization for such uses by the General Assembly. The Morton Grove ordinance, in effect, is an attempt by a municipality to preempt clearly defined State policy in an area where the State, not municipalities, has authority to act.

The majority's conclusion that municipalities may circumvent clearly expressed State policy except in those limited instances · when the General Assembly has expressly preempted municipal action is incorrect. To the contrary, this court has invalidated municipal or county actions when such actions affect areas which are "generally recognized as falling within the competence of State rather than local authorities" (7 Proceedings 1621-22), particularly when the municipal actions conflict with existing State law. See, *e.g.*, *Metropolitan Sanitary District v. City of Des Plaines* (1976), 63 Ill. 2d 256; *City of Carbondale v. Yehling* (1983), 96 Ill. 2d 495; *Paper Supply Co. v. City of Chicago* (1974), 57 Ill. 2d 553; *City of Des Plaines v. Chicago & North Western Ry. Co.* (1976), 65 Ill. 2d 1; *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537.

Thus, because the possession of firearms has traditionally been regulated by State law, and because local firearms laws like the one adopted by Morton Grove would necessarily affect persons beyond municipal boundaries, confuse law-abiding citizens and are counterproductive, I am of the opinion that this subject is of State and not local concern. I would therefore hold that Morton Grove has exceeded its home rule authority under article VII, section 6(a), of our constitution in enacting this ordinance.

For the above-stated reasons, I must respectfully dissent.

RYAN, C.J., and UNDERWOOD, J., join in this dissent.