(No. 49229.—

THE CITY OF CHICAGO, Appellee, v. WALLACE WILSON *et al.*, Appellants.

*Opinion filed May 26, 1978.*

WARD, C.J., and UNDERWOOD and RYAN, JJ., dissenting.

Wendy Meltzer and Thomas F. Geraghty, of the Northwestern Legal Assistance Clinic, of Chicago, and David Goldberger, of the American Civil Liberties Union, of Chicago, for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Mary Denise Cahill, Assistant Corporation Counsel, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the defendants, Wallace Wilson and Kim Kimberley, were convicted of having violated section 192—8 of the Municipal Code of the city of Chicago (Code), which prohibits a person from wearing clothing of the opposite sex with the intent to conceal his or her sex. Each defendant was fined $100. The appellate court affirmed (44 Ill. App. 3d 620), and this court granted leave to appeal.

Defendants were arrested on February 18, 1974, minutes after they emerged from a restaurant where they had had breakfast. Defendant Wilson was wearing a black, knee-length dress, a fur coat, nylon stockings and a black wig. Defendant Kimberley had a bouffant hair style and was wearing a pants suit, high-heeled shoes and cosmetic makeup. Defendants were taken to the police station and were required to pose for pictures in various stages of undress. Both defendants were wearing brassieres and garter belts; both had male genitals.

Prior to trial, defendants moved to dismiss the complaint on the grounds that section 192—8 was unconstitutional in that it denied them equal protection of the law and infringed upon their freedom of expression and privacy. This motion was denied.

At trial, the defendants testified that they were transsexuals, and were, at the time of their arrests, undergoing psychiatric therapy in preparation for a sex reassignment operation. As part of this therapy, both defendants stated, they were required to wear female clothing and to adopt a female life-style. Kimberley stated

that he had explained this to the police at the time of his arrest. Both defendants said they had been transsexuals all of their lives and thought of themselves as females. The question of arrest is not an issue.

Section 192—8 of the Code provides:

"Any person who shall appear in a public place *** in a dress not belonging to his or her sex, with intent to conceal his or her sex, *** shall be fined not less than twenty dollars nor more than five hundred dollars for each offense."

Defendants contend that section 192—8 is unconstitutionally vague, overly broad, and denies them equal protection under the law on account of sex. They argue that the section is overly broad, both on its face and as applied to them, in that it denies them freedom of expression protected by the first amendment and personal liberties protected by the ninth and fourteenth amendments of the United States Constitution.

The city asserts that section 192—8 is neither vague nor overly broad and that the section does not deny defendants equal protection under the law.

We find that the above-cited section, as applied to defendants here, is unconstitutional, and in so doing we do not, therefore, reach the issues of vagueness and equal protection.

The existence of unspecified constitutionally protected freedoms cannot be doubted. *E.g., Roe v. Wade* (1973), 410 U.S. 113, 152-54, 35 L. Ed. 2d 147, 176-78, 93 S. Ct. 705, 726-27; *Griswold v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678.

In *Kelley v. Johnson* (1976), 425 U.S. 238, 47 L. Ed. 2d 708, 96 S. Ct. 1440, the Supreme Court was confronted with the question of whether one's choice of appearance was constitutionally protected from governmental infringement. At issue was an order promulgated by petitioner, the commissioner of police for Suffolk

County, New York, which order established hair-grooming standards for male members of the police force. The court acknowledged that the due process clause of the fourteenth amendment "affords not only a procedural guarantee against deprivation of 'liberty,' but likewise protects substantive aspects of liberty against unconstitutional restrictions by the State." (425 U.S. 238, 244, 47 L. Ed. 2d 708, 713, 96 S. Ct. 1440, 1444.) The court observed, however, that its prior cases offered little, if any, guidance on whether the citizenry at large has some sort of liberty interest in matters of personal appearance. It assumed for purposes of its opinion that such did exist.

In determining the scope of that interest and the justification that would warrant its infringement, the court distinguished claims asserted by individuals of a uniformed police department from claims by the citizenry at large, noting that the distinction was "highly significant." (425 U.S. 238, 245, 47 L. Ed. 2d 708, 714, 96 S. Ct. 1440, 1444.) The court held that, in the context of the case before it, the burden rested with the respondent police officer to demonstrate that there was no rational connection between the regulation and the police department's legitimate function of promoting safety of persons and property. After analyzing the need for uniformity and discipline within the ranks of the police department, the court concluded that the challenged order was rationally related to two legitimate objectives: first, "to make police officers readily recognizable to the members of the public," and second, to foster the "espirit de corps which such similarity is felt to inculcate within the police force itself." (425 U.S. 238, 248, 7 L. Ed. 2d 708, 716, 96 S. Ct. 1440, 1446.) Mr. Justice Powell, who specially concurred, noted that "[w]hen the State has an interest in regulating one's personal appearance *** there must be a weighing of the degree of infringement of the individual's liberty interest against the need for the regulation." 425 U.S. 238,

249, 47 L. Ed. 2d 708, 717, 96 S. Ct. 1440, 1447.

This court has long recognized restrictions on the State's power to regulate matters pertinent to one's choice of a life-style which has not been demonstrated to be harmful to society's health, safety or welfare. *E.g., People v. Fries* (1969), 42 Ill. 2d 446 (statute requiring the wearing of a motorcycle helmet held invalid); *City of Chicago v. Drake Hotel Co.* (1916), 274 Ill. 408 (ordinance prohibiting public dancing in restaurants held invalid); *Town of Cortland v. Larson* (1916), 273 Ill. 602 (ordinance prohibiting the private possession of liquor held invalid); *City of Zion v. Behrens* (1914), 262 Ill. 510 (ordinance prohibiting smoking in public parks and on public streets held invalid).

In *Haller Sign Works v. Physical Culture Training School* (1911), 249 Ill. 436, a case which involved the regulation of billboards for aesthetic purposes, this court noted:

"The citizen has always been supposed to be free to determine the style of architecture of his house, the color of the paint that he puts thereon, the number and character of trees he will plant, the style and quality of the clothes that he and his family will wear, and it has never been thought that the legislature could invade private rights so far as to prescribe the course to be pursued in these and other like matters, although the highly cultured may find on every street in every town and city many things that are not only open to criticism but shocking to the aesthetic taste." (249 Ill. 436, 443.)

The notion that the State can regulate one's personal appearance, unconfined by any constitutional strictures whatsoever, is fundamentally inconsistent with "values of privacy, self-identity, autonomy, and personal integrity that *** the Constitution was designed to protect." *Kelley*

*v. Johnson* (1976), 425 U.S. 238, 251, 47 L. Ed. 2d 708, 718, 96 S. Ct. 1440, 1447 (Marshall, J., dissenting).

Finding that the Constitution provides an individual some measure of protection with regard to his choice of appearance answers only the initial issue. Resolution of the second issue is more difficult: to determine the circumstances under which the interest can be infringed. It is at this juncture that *Kelley,* and cases subsequent thereto, offer little guidance. With the exception of one Federal decision—*Williams v. Kleppe* (1st Cir. 1976), 539 F.2d 803—all of the cases subsequent to *Kelley* have involved regulations set in the context of an organized governmental activity. (*E.g., East Hartford Education Association v. Board of Education* (2d Cir. 1977), 562 F.2d 838, 860-63.) Such circumstance is distinguished from that in which a regulation, as here, controls the dress of the citizens at large. This distinction, as noted in *Kelley,* is "highly significant."

Even though one's choice of appearance is not considered a "fundamental" right (*Richards v. Thurston* (1st Cir. 1970), 424 F.2d 1281, 1284-85), the State is not relieved from showing some justification for its intrusion. As *Kelley* suggests, the degree of protection to be accorded an individual's choice of appearance is dependent upon the context in which the right is asserted. It is, therefore, incumbent upon the court to analyze both the circumstances under which the right is asserted and the reasons which the State offers for its intrusion.

In this court, the city has asserted four reasons for the total ban against cross-dressing in public: (1) to protect citizens from being misled or defrauded; (2) to aid in the description and detection of criminals; (3) to prevent crimes in washrooms; and (4) to prevent inherently antisocial conduct which is contrary to the accepted norms of our society. The record, however, contains no evidence to support these reasons.

If we assume that the ordinance is, in part, directed toward curbing criminal activity, the city has failed to demonstrate any justification for infringing upon the defendants' choice of public dress under the circumstances of this case.

Both defendants testified that they are transsexuals and were, at the time of their arrest, undergoing psychiatric therapy in preparation for a sex-reassignment operation. (For a general discussion of the therapy required prior to sex-reassignment surgery, see Comment, *M.P. v. J.T.: An Enlightened Perspective on Transsexualism*, 6 Cap. U.L. Rev. 403, 407-10 (1977); Note, *The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma*, 7 Conn. L. Rev. 288, 296 n.28 (1975); Comment, *Transsexualism, Sex Reassignment Surgery and the Law*, 56 Cornell L. Rev. 963, 972-74 (1971) (wherein it is noted that cross-dressing is recommended as part of a sex-reassignment preoperative therapy program).) Neither of the defendants was engaged in deviate sexual conduct or any other criminal activity. Absent evidence to the contrary, we cannot assume that individuals who cross-dress for purposes of therapy are prone to commit crimes.

The city's fourth reason (as noted above) for prohibiting the defendants' choice of public dress is apparently directed at protecting the public morals. In its brief, however, the city has not articulated the manner in which the ordinance is designed to protect the public morals. It is presumably believed that cross-dressing in public is offensive to the general public's aesthetic preference. There is no evidence, however, that cross-dressing, when done as a part of a preoperative therapy program or otherwise, is, in and of itself, harmful to society. In this case, the aesthetic preference of society must be balanced against the individual's well-being.

Through the enactment of section 17(1)(d) of the Vital Records Act (Ill. Rev. Stat. 1977, ch. 111½, par.

73–17(1)(d)), which authorizes the issuance of a new certificate of birth following sex-reassignment surgery, the legislature has implicitly recognized the necessity and validity of such surgery. It would be inconsistent to permit sex-reassignment surgery yet, at the same time, impede the necessary therapy in preparation for such surgery. Individuals contemplating such surgery should, in consultation with their doctors, be entitled to pursue the therapy necessary to insure the correctness of their decision.

Inasmuch as the city has offered no evidence to substantiate its reasons for infringing on the defendants' choice of dress under the circumstances of this case, we do not find the ordinance invalid on its face; however, we do find that section 192–8 as applied to the defendants is an unconstitutional infringement of their liberty interest. The judgments of the appellate court and the circuit court are reversed and the cause is remanded to the circuit court with directions to dismiss.

*Judgments reversed;*
*cause remanded,*
*with directions.*

MR. CHIEF JUSTICE WARD, dissenting:

The majority states that it does not find the ordinance to be unconstitutional on its face, but it concludes that the ordinance was unconstitutional as applied to these defendants. That conclusion is founded on the premise that the defendants' conduct was part of a psychiatrically prescribed program to prepare them for sex-reassignment surgery. The only testimony in support of the defendants' claim was that of the defendants themselves. No psychiatrist was called to testify that the defendants had been diagnosed as transsexuals or that cross-dressing had been prescribed as preoperative therapy. No letter or statement was offered in evidence. Neither defendant named the psychiatrist from whom he was receiving treatment.

Indeed, the defendant Wilson, on cross-examination, testified that he didn't know what sex-reassignment surgery would involve and said he did not know the doctor who would perform it.

The majority ignores a basic consideration—that the credibility to be given the defendants' testimony was for the trial judge—and proceeds to discuss therapy in preparation for sex-reassignment surgery. That is a subject of sensitivity and importance, but I consider it is not reached here.

UNDERWOOD and RYAN, JJ., join in this dissent.