Jane DOE I et al., Plaintiffs,

v.

James McCONN et al., Defendants.

M. B., Plaintiff,

v.

The CITY OF HOUSTON et al., Defendants.

Civ. A. Nos. H–77–42, H–79–922.

United States District Court,
S. D. Texas,
Houston Division.

April 3, 1980.

J. Patrick Wiseman, Pape & Mallett, Houston, Tex., for plaintiffs.

Terrance Fiddes, Asst. City Atty., Houston, Tex., for defendants.

## STATEMENT OF CASE

NORMAN W. BLACK, District Judge.

These are consolidated actions wherein Plaintiffs allege that § 28–42.4 of the Code of Ordinances of the City of Houston constitutes a deprivation, under color of state law, of rights, privileges, and immunities secured to them by the First, Fourth, Fifth, Eighth, Ninth, Tenth and Fourteenth Amendments to the Constitution and the laws of the United States. They seek declaratory and injunctive relief. The case is bifurcated to the extent that the Court will not consider the issue of damages at this time. The Jane Doe Plaintiffs and Plaintiff M. B., in various stages of sexual transition, are suing under fictitious names to insulate themselves from possible harassment, to protect their privacy, and to protect themselves from prosecution resulting from this action.

## FINDINGS OF FACT

Plaintiffs are all adult citizens of the United States of full age and capacity and residents of Houston, Texas. Plaintiffs JANE DOE I, JANE DOE II, JANE DOE III, JANE DOE IV, JANE DOE V, JANE DOE VI, JANE DOE VII and M. B. (hereinafter referred to as the "transsexual Plaintiffs") are fully diagnosed transsexuals who, as of the commencement of this cause of action, had not undergone sexual reassignment surgery. JANE DOE III, JANE DOE V and JANE DOE VII have undergone surgery since the instigation of this cause.

Plaintiff MAXWELL is the treating physician for certain of the Plaintiff Transsexuals.

The Defendants are past and present City of Houston officials charged with the responsibility of promulgating and/or enforcing the Ordinance in question. The City of Houston is also a Defendant.

All of the Defendants' actions complained of in this cause were taken under color of state law.

Transsexualism is a rare syndrome of gender identity disturbance which appears to occur more frequently in male than in female subjects. The cause of this syndrome is unknown. Treatment of this condition in adults by psychotherapy alone has been futile. Administration of hormones of the opposite sex followed by sex-conversion operations has resulted in better emotional and social adjustment by the transsexual individual in the majority of cases. Prior to undergoing surgery, the patient is required to be seen by a team of specialists in physical and psychological medicine over an extensive period of time, generally one to two years.

This psychological evaluation includes intensive interviews and testing, interviews with the patient's family where possible, and a course of supportive therapy. Physical testing includes: general examinations, 17 Ketosteroids, other endocrinological studies, chromosome analysis, and, in some instances, semen analysis. The patient is treated with heterotypic sex hormones and is required to live, dress, and become rehabilitated in the cross-gender role.

There are gender identity syndromes which have a resemblance to transsexualism, but which are nevertheless not to be confused with this condition. Prior to surgery great care must be taken in diagnosis, since the radical physical alteration which has proved to be the one effective therapy for the transsexual might represent an irreparable and tragic mistake for the individual with a related but different disorder. There is a resemblance between homosexuality, transvestism, and transsexualism, with observable common areas of concern, but essential distinctions become apparent to the trained psychiatrist.

Most transvestites cross-dress, or employ the imagery of cross-dressing, in order to achieve sexual satisfaction. The effeminate homosexual occasionally may cross-dress, but he does not share the transvestite's compulsion to do so. Although he plays the feminine role with his male partner, he has no compelling desire to be a woman.

The transsexual begins to cross-dress usually before puberty. Later, he may experience great conflict about this, and apply himself vigorously to the masculine role, perhaps even going so far as to marry. Eventually, however, his gender identity reveals itself as so overpoweringly female that nothing less than the alteration of his masculine body traits, as well as abandonment of the masculine clothes and role, can afford him relief. Homosexual relations are usually repugnant to him.

Care also must be taken to distinguish borderline schizophrenia, with temporary illusions and obsessions of transsexualism, from true transsexualism.

The criteria for diagnosis are by no means absolute, and research is proceeding with the purpose of further refining the distinctions between the various gender identity syndromes. To date, it is generally agreed that the common requirement of a pre-operative period of six to twenty-four months of living and working in the gender role of choice provides the best index of judgment for eliminating non-transsexuals.

Most, if not all, specialists in gender identity are agreed that the transsexual condition establishes itself very early, before the child is capable of elective choice in the matter, probably in the first two years of life; some say even earlier, before birth during the fetal period. These findings indicate that the transsexual has not made a choice to be as he is, but rather that the choice has been made for him through many causes preceding and beyond his control. Consequently, it has been found that attempts to treat the true adult transsexual psychotherapeutically have consistently met with failure.

Yet, some sort of treatment is urgently indicated, for in many instances his suffering is so intense that suicide and self-mutilation are not uncommon.

Although the causes of the transsexual condition are not yet understood, extensive research in recent years has indicated some possible biological and psychological factors which might render one individual more vulnerable than another to develop in this way. Experiments with animals suggest that the altering of hormone balances, during certain limited, critical pre-natal periods, will affect those areas of the brain that regulate masculine and feminine behavior. Other medications administered to the pregnant mother (barbiturates, for example) may also have an effect on the development of the unborn child, as may certain intrauterine viral infections.

Transsexual symptoms need not develop under such circumstances, and usually do not. Predetermining circumstances may simply make the individual more susceptible to the development of transsexualism. The postnatal determinants of gender identity— the child's relationships with those who form his early social environment—may then supply the deciding factor.

Since some patients presenting transsexual symptoms and desiring surgery may change their mind, a period of hormone therapy and of living in the desired gender role is strongly indicated, so that those whose motives are confused or weak may discover this for themselves through direct experience. The psychiatrist's function will be to assist the patient to explore and clarify his motivation and to find another resolution of his conflicts.

Similar exploration will, of course, be helpful for the transsexual for whom surgery is indicated. In addition, he will require support in making necessary adjustments to his new social role, and in coping with his family's reactions to his decision. Information or referrals may be given to assist the transsexual in establishing a new identity through legal procedures and documents.

These transsexual Plaintiffs have each sought treatment and procedures required of transsexuals who wish to undergo sexual reassignment surgery. Said process is under the immediate care and supervision of medical doctors including psychiatrists such as Plaintiff MAXWELL. Each transsexual, as a part of the process, undergoes hormonal treatments and/or implants and psychological counselling for varying periods of

time preceding actual surgery for sexual reassignment.

As noted *supra*, an integral part of the presurgical process requires that a transsexual wear the clothing of the gender to which reassignment is sought throughout the pre-operative stage. Said procedures are medically and psychologically necessary for the true integration of the body and mind throughout the transition period of the developing gender. In fact, cross-dressing is mandatory, as surgery will generally not be performed unless cross-dressing has occurred for a minimum specified period of time.

The policies and procedures of the Defendants make it illegal for the transsexual Plaintiffs to appear in public areas in women's clothing. Said policies and procedures directly inhibit the treatment of the transsexual Plaintiffs and their reassignment. Defendants have arrested and prosecuted certain of the Plaintiffs, pursuant to § 28–42.4 of the Code of Ordinances of the City of Houston which states:

> It shall be unlawful for any person to appear on any public street, sidewalk, alley, or other public thoroughfare dressed with the designed intent to disguise his or her true sex as that of the opposite sex.

In determining whether or not a person is dressing as that of the opposite sex, the person is required to disrobe. There is no exception or defense under the ordinance for transsexuals, including those under a doctor's care. The ordinance has been regularly enforced; for the year 1977, 53 persons were arrested in accordance with it.

Plaintiff MAXWELL is a practicing psychiatrist. He counsels with transsexual patients, including four of the transsexual Plaintiffs here, in conjunction with and prior to surgery to be performed at the University of Texas Medical Branch. His pre-

scribed treatment, required for adequate sexual integration, is thwarted by the Ordinance in direct contravention of medical and psychological indications.

Defendants have not submitted evidence of a state interest in the enforcement of the Ordinance in question. In fact, the City of Houston presently has in force Section 24–42.6 of the Code of Ordinances to prevent crimes in washrooms, which states:

> It shall be unlawful for any person to knowingly and intentionally enter any public restroom designated for the exclusive use of the sex opposite to his or hers without the permission of the owner, tenant, manager, lessees or other person in charge of the premises, in a manner calculated to cause a disturbance. (Ord. No. 72–904, § 2, 6–6–72).

### CONCLUSIONS OF LAW

This suit is properly brought pursuant to 42 U.S.C. § 1983, and its jurisdictional implementation, 28 U.S.C. § 1343. *See Monell v. N.Y. City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ Plaintiffs have standing, as a matter of the case-or-controversy requirement associated with Art. III of the Constitution and the express terms of the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, to seek declaratory and injunctive relief. Pre-operative transsexual Plaintiffs have alleged threats of prosecution that cannot be characterized as speculative.[1] *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

■ Furthermore, abstention is inappropriate under the facts presented.[2] Id.; *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct . 1428, 51 L.Ed.2d 752 (1977).

■ We find that the Ordinance, as applied to individuals undergoing psychiatric

---

1. This Court need not concern itself with the issues of standing and mootness with respect to the doctor and post-operative Plaintiffs because of the nature of the relief sought. The Court is satisfied that one or more of the Plaintiffs have standing.

2. Again, the Court need not be concerned at this juncture that abstention may be appropriate as to a particular plaintiff. Only declaratory and injunctive relief are considered herein.

therapy in preparation for sex-reassignment surgery, is unconstitutional.

■ The Fourteenth Amendment affords not only a procedural guarantee against the deprivation of liberty, but also protects substantive aspects of this interest against unconstitutional restrictions by the States. *See Kelley v. Johnson*, 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976). In *Kelley*, the Supreme Court assumed, without deciding, that individuals have "some sort of 'liberty' interest within the Fourteenth Amendment in matters of personal appearance." Justice Powell's concurring opinion in *Kelley* is the view shared by this Court, that "no negative implication" as to the more general liberty interest in personal appearance is to be drawn from the *Kelley* majority opinion. *Id.* at 249, 96 S.Ct. at 1447; *East Hartford Ed. Ass'n v. Bd. of Ed. Etc.*, 562 F.2d 838, 841 (2nd Cir. 1977). "The notion that the state can regulate one's personal appearance, nonconfined by any constitutional strictures whatsoever, is fundamentally inconsistent with 'values of privacy, self-identity, autonomy, and personal integrity that . . . the Constitution was designed to protect.'" *The City of Chicago v. Wallace Wilson, et al.*, 75 Ill.2d 525, 27 Ill.Dec. 458, 389 N.E.2d 522 (1978), citing *Kelley v. Johnson, supra* at 251 (Marshall, J., dissenting). Moreover, the Supreme Court has recognized a constitutionally-derived right to control one's own body. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

The Court must consider the constitutional importance of the affected individual interests and the need for regulation. In their Answer to the Complaint, Defendants state: "The Constitutional infringements, if any exist, are so insignificant as to be outweighed by the public's desire and the police department's need to know someone's true sexual identity."

Defendants, however, have no concrete evidence to justify their intrusion under the circumstances herein. Moreover, this Court cannot perceive of any reasons for infringing on Plaintiffs' constitutional rights under these circumstances.

In *The City of Chicago v. Wilson, supra*, a case involving a similar fact situation, the Court stated:

[T]he city . . . asserted four reasons for the total ban against cross-dressing in public: (1) to prevent citizens from being misled or defrauded; (2) to aid in the description and detection of criminals; (3) to prevent crimes in washrooms; and (4) to prevent inherently antisocial conduct which is contrary to the accepted norms of our society. The record, however, contains no evidence to support these reasons.

If we assume that the ordinance is, in part, directed toward curbing criminal activity, the city has failed to demonstrate any justification for infringing upon the defendants' choice of public dress under the circumstances of this case.

Both defendants testified that they are transsexuals and were, at the time of their arrest, undergoing psychiatric therapy in preparation for a sex-reassignment operation. . . . Neither of the defendants were engaged in deviate sexual conduct or any other criminal activity. Absent evidence to the contrary, we cannot assume that individuals who cross-dress for purposes of therapy are prone to commit crimes.

The city's fourth reason . . . for prohibiting the defendants' choice of public dress is apparently directed at protecting the public morals. In its brief, however, the city has not articulated the manner in which the ordinance is designed to protect the public morals. It is presumably believed that cross-dressing in public is offensive to the general public's aesthetic preference. There is no evidence, however, that cross-dressing, when done as a part of a preoperative therapy program or otherwise, is, in and of itself, harmful to society. In this case, the aesthetic preference of society must be balanced against the individual's well-being.

Since the challenged Ordinance fails to pass even a minimal degree of scrutiny, there is no need to determine which standard of scrutiny is appropriate.

Accordingly, the Ordinance, as applied herein, is unconstitutional.

Since transsexual Plaintiffs who cross-dress in preparation for sex-reassignment surgery have been prosecuted under the Ordinance in the past and are threatened with repeated prosecutions in the future, prospective injunctive relief is justified. *See Wooley v. Maynard, supra* at 712, 97 S.Ct. at 1434.