SUZANNE LINDLEY DALY, Formerly Known as TIM
DALY, Appellant, v. NAN TOEWS DALY, Respond-
ENT.

No. 15423

March 6, 1986                           715 P.2d 56

*Ann Casamajor,* Albany, California, and *Semenza & Brown,*
Reno, for Appellant.

*Nada Novakovich,* Reno, for Respondent.

## OPINION

By the Court, STEFFEN, J.:

Appellant, a transsexual, contends that there is no legal basis for the order terminating her parental rights and that the lower court is merely and improperly enforcing the private prejudices of the respondent. Palmore v. Sidote, 104 S.Ct. 1879 (1984). We have considered the arguments presented by counsel, carefully reviewed the record and conclude that the district court ruled correctly and should be affirmed.

Respondent Nan Daly is the natural mother of the child. Appellant Suzanne Daly is the natural father of the child. Appellant's name was changed from Tim Daly on December 9, 1982. Appellant underwent sex-reassignment surgery, changing her sexual anatomy from male to female, on December 13, 1983, after a trial period of living as a female for approximately one year.

The parties were married September 17, 1969, at Oakland, California. The minor child at issue in this action, Mary Toews Daly, was born August 21, 1973, at Oakland. A final decree of divorce was entered February 17, 1981, at Reno, Nevada, in the Second Judicial District Court. Respondent was awarded custody and control of Mary, subject to the visitation rights of appellant. Initially, appellant regularly exercised visitation rights under the decree, seeing the child approximately one weekend per month, alternate holidays and one month in the summer of 1981.

While Mary was with appellant in August, 1981, appellant revealed that she was a transsexual and would be undergoing hormonal and surgical reassignment as a female under the care of medical professionals.[1] Appellant told Mary that neither respondent nor her grandmother, who lives with respondent, should know of appellant's plans. Mary did not reveal appellant's intentions for six months.

When Mary returned from her visit to Oakland in August of 1981, respondent noticed she was withdrawn and afraid to tell her

---

[1]Soon thereafter, Suzanne introduced Mary to the community of alternate lifestyles by taking her to a session at the Pacific Center where other transsexuals gather for support and counseling and discuss their experiences with one another.

something. On February 14, 1982, Mary revealed her father's plans to her mother. Mary was taken to a psychologist and evaluated by Dr. Towle, who advised respondent that it was very dangerous to allow Mary to be in the company of her father again.

Respondent testified that when Mary returned from the August visitation with her father, she would vacillate from being wide awake to being very sluggish. A certified academically talented child since seven years of age, she would sit at the kitchen table for hours cutting a large piece of paper into small pieces. She would take a pencil and trace the grain of the oak floor for hours. She wet the bed and, in fact, was incontinent in class a week prior to trial. Mary had not wet the bed since she was two years old. She had a short attention span and could not follow instructions, nor perform simple tasks. She also became inattentive and her handwriting degenerated into a scrawl. In addition, Mary became quiet and withdrawn.

In May of 1982, the respondent mother petitioned the lower court to terminate appellant's parental rights. On April 11, 1983, the court rendered its decision terminating appellant's parental rights. Appellant thereafter appealed.

In Carson v. Lowe, 76 Nev. 446, 357 P.2d 591 (1960), this Court recognized its duty to scrutinize the termination of parental rights. Moreover, this Court in Cloninger v. Russell, 98 Nev. 597, 655 P.2d 528 (1982), adopted the clear and convincing evidence standard of proof in parental rights termination proceedings as set forth in Santosky v. Kramer, 455 U.S. 745 (1982). NRS 128.110 authorizes the termination of parental rights upon finding grounds pursuant to NRS 128.105. In the recent decision of Champagne v. Welfare Division of the Nevada State Department of Human Resources, 100 Nev. 640, 691 P.2d 849 (1984), we elaborated on the grounds set forth in NRS 128.105 and held that there must be a finding of both jurisdictional and dispositional grounds in order to justify issuance of a termination order. Our review of the evidence in the instant case persuades us that both grounds were satisfied.

## JURISDICTIONAL GROUNDS

NRS 128.105[2] specifies the jurisdictional grounds for termina-

---

[2]NRS 128.105 recognizes the following jurisdictional grounds:
  1. Abandonment of the child;
  2. Neglect of the child;
  3. Unfitness of the parent;
  4. Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;
  5. Only token efforts by the parent or parents:

tion. The district court primarily focused upon the risk of serious physical, mental or emotional injury to the child if visitation were resumed and the child were forced to maintain contact with appellant.[3] NRS 128.105(4).

At trial Dr. Weiheir, respondent's expert witness who examined Mary, testified that there is a serious risk of emotional or mental injury to the child if she were allowed to be in her father's presence. In addition, the doctor testified that Mary would not be injured if she did not see her father again. The doctor also considered alternatives, such as consultation with psychologists and psychiatrists and testified there was no guarantee it would work and that there would be a serious risk of emotional injury.[4] It is precisely this risk that the lower court was asked to eliminate. It must be remembered that in termination proceedings, the interests of the child are paramount and a child should not be forced to undergo psychological adjustments, especially in view of the risk involved, solely to avoid termination of a parent's rights. Certainly a parent's rights should be preserved if at all possible, but not at the expense of the child.

Appellant's expert witness also provided support for respondent's position by testifying that there are children who are not able to accept a parent as a transsexual. This witness also stated this was a new area and concluded there is a risk that there would

(a) To support or communicate with the child;
(b) To prevent neglect of the child;
(c) To avoid being an unfit parent;
(d) To eliminate the risk of serious physical, mental or emotional injury to the child, or
6. With respect to termination of parental rights of one parent, the abandonment by that parent.

[3]In addition to the risk to Mary involved in this case, the evidence indicates that appellant left Mary in the care and custody of Nan Daly without provision for the child's support and without communication for more than six months. This constitutes a presumption of abandonment under NRS 128.012(2). Abandonment is also an acceptable jurisdictional ground for termination proceedings. *See* NRS 128.105(1). Moreover, what little communication or attempted communication existed during this period consisted of token efforts; again a recognized jurisdictional ground. *See* NRS 128.105(5)(a). Hence, the court's decision was fully supported on the issue of jurisdiction.

[4]While other court's have imposed certain restrictions upon visitation with the child, such as the length of visitation, the location, or type of permissible activity, in this case such restrictions would accomplish nothing. The court recognized the effect appellant's transsexualism had upon Mary; any modification in visitation would not change that fact. To reiterate, the court did not conclude that appellant was an unfit parent merely because she is a transsexual. Rather, the court recognized the *effect* the situation had upon Mary in this time of her life and the serious risk of emotional or mental injury if visitation were allowed. Mary is very uncomfortable about the possibility of resuming visitation and is presently unprepared to cope with such a prospect.

be harm done in either direction. Dr. Weiheir, however, had the opportunity to observe and interview Mary and determined the risk to Mary would exist only if visitation were forced upon Mary.

Notwithstanding the possible harm that would befall Mary if visitation were resumed, NRS 128.107 provides that the child's desires regarding the termination should be a specific consideration, if the child has sufficient capacity to express his or her desires. Considering Mary's age and intelligence, the lower court found her to have the requisite capacity. We agree with the court's finding. In the present case, Mary told Dr. Weiheir and the trial judge that she did not want to see her father. Mary also said it would be disturbing to visit with her father and made it graphically clear that she didn't want to see him again.

The evidence presented in this case decisively establishes the jurisdictional grounds necessary to terminate parental rights. Therefore, our attention will now focus upon the dispositional grounds.

## DISPOSITIONAL GROUNDS

Dispositional grounds are satisfied when it is found that the termination is in the child's best interests. At trial, it was undisputed that Mary's mother, Nan, is a very loving and conscientious mother who provides a desirable environment for her daughter. Nan always keeps Mary well fed and clothed and is absolutely dedicated to her child. At the present time, Mary is happy and well adjusted. Nevertheless, if visitation were permitted, there would be a risk of serious maladjustment, mental or emotional injury. Hence, recognizing Mary's present situation, her attitude and feelings, and the substantial risk of emotional or mental injury were she forced to visit with her father, it appears clear that termination of appellant's parental rights is in Mary's best interest.[5]

The trial court was fully aware of the seriousness and finality of a decree terminating parental rights, noting that such a remedy should be applied with caution. The court carefully considered

---

[5]It was shown that Mary is at the tender age when she is very much concerned about the impression of her peers and doesn't want to have any sort of uncomfortable fears. Mary would prefer to have her personal life remain a private event. By terminating Suzanne's parental rights, Mary will finally have the assurance and comfort of knowing the visitation matter is settled. Also, Mary's emotional state is preserved, thereby providing her the forum to mature and resolve the situation in her own way. There is nothing to prevent Mary from rekindling the relationship with her father in later years if she so desires, but that choice should be hers, made at a time when the risk of emotional or mental injury is eliminated.

the record and found abandonment and risk of serious mental and emotional harm. The court also found Suzanne to be a selfish person whose own needs, desires and wishes were paramount and were indulged without regard to their impact on the life and psyche of the daughter, Mary.

Our review of the record indicates that the district court's findings are fully supported therein. Suzanne's efforts to regain visitation rights are shown to be a continuing source of apprehension to the child. Suzanne's solution is to subject the child to psychiatric counseling in order to change her mental attitude concerning her father's condition. Inferentially, the child will be more likely to succumb to a process of mental conditioning if she realizes that she will be forced to endure periods of visitation with Suzanne. However, expert testimony at trial reflects substantial doubt as to the success of such counseling at best, and a serious risk of further emotional injury to the child at worst. Such considerations are further complicated by the apparent degree of Mary's revulsion over Suzanne and the irretrievable loss of Suzanne's former relationship with Mary as a parent-father. The future prospects for emotional family stability are also dimmed by Suzanne's indication that Mary should know lesbians, homosexuals and transsexuals and "be a part of their lives" if "they are my [Suzanne's] friends." Suzanne, who admitted that many of her friends are to be found among the aforementioned groups, has thus postured herself in a position of recurring conflict with the child's mother and the "traditional" upbringing enjoyed by Mary during her formative years. The resulting equation does not bode well for the emotional health and well-being of the child. This Court can perceive no basis for such disruption of Mary's life. Nor do we see the necessity for inflicting a continuing sense of instability and uneasiness on this child. As noted previously, when Mary reaches the age of majority she can decide whether to reinstate a relationship with Suzanne. In the meantime, given the circumstances concerning Mary's view of Suzanne and the extent of her opposition to further ties with a vestigial parent, it can be said that Suzanne, in a very real sense, has terminated her own parental rights as a father. It was strictly Tim Daly's choice to discard his fatherhood and assume the role of a female who could never be either mother or sister to his daughter.

In sum, the record discloses the fact that appellant has paid no support for over a year, and what little communication there was during this time may be appropriately described as "token." Moreover, the court concluded that termination of appellant's parental rights would be in Mary's best interest. We have determined that the trial court's findings and decision are clearly and convincingly supported by the evidence. Both the jurisdictional

and dispositional requisites for the termination of appellant's rights as a parent have been satisfied.

The trial court had all the parties before it, observed their demeanor and weighed their credibility. In this area of such sensitivity, we must accord the lower court due deference. We have considered appellant's remaining contentions and conclude they either lack merit or do not require a reversal. Accordingly, we affirm the lower court's decision.

MOWBRAY, C. J., and YOUNG, J., concur.

GUNDERSON, J., with whom SPRINGER, J., concurs, dissenting:

The natural mother of Mary Toews Daly (Mary), Nan Toews Daly (Nan), filed a petition to terminate the parental rights of the natural father of Mary, who is now legally known as Suzanne Lindley Daly.[1] After a hearing, the district court terminated the father's parental rights over Mary. He then filed the instant appeal. We should reverse, because the district court lacked clear and convincing evidence which demonstrated the need to terminate parental rights over Mary. *At the outset, it should be emphasized that the father does not seek visitation rights at the present time. Hence, with all respect to my brethren in the majority, it seems inappropriate to bottom a ruling against him on the supposition that visitation with him could injure Mary.*

I

The parties were married in 1969. Their daughter, Mary, was born in August, 1973. By 1979, they had separated. After the

---

[1]The father's name formerly was Tim Daly. He changed his legal name to Suzanne Lindley Daly in December, 1982. In this opinion, to avoid confusion I shall refer to the parties as the "mother" and the "father."

The father was a transsexual. A transsexual, or a person with sexual dysphoria, is biologically the member of one gender while considering himself as a member of the other gender. Green, *Sexual Identity of 37 Children Raised by Homosexual or Transsexual Parents,* 135 Am.J.Psych. 692, 692 (1978). The medical profession does not know the etiology of transsexuality; however, a person's self-identification as a transsexual appears to occur early in life, probably by the age of four, but might even occur prenatally. *See* Doe v. McConn, 489 F.Supp. 76, 78 (S.D.Tex. 1980); M.T. v. J.T., 355 A.2d 204, 205 (N.J.Super.Ct.App.Div. 1976). Currently, psychotherapy appears to be an ineffective treatment for transsexuality. *See* Doe v. Department of Pub. Welfare, 257 N.W.2d 816, 819 (Minn. 1977). According to Ira Pauly, M.D., a psychiatrist and expert in transsexuality, who testified at trial, the medical profession believes that sex reassignment surgery is the best treatment available for a transsexual. For further information on transsexuality, see Comment, M.T. v. J.T.: *An Enlightened Perspective on Transsexualism,* 6 Cap.L.Rev. 403, 403-10 (1976-1977); Comment, *The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma,* 7 Conn.L.Rev. 288, 288-94 (1974-1975); Comment, *Transsexualism, Sex Reassignment Surgery, and the Law,* 56 Cornell L.Rev. 963, 965-72 (1970-1971).

separation, the mother worked and resided with Mary in Reno. The father lived in Oakland, California, where he worked at the Lawrence Berkeley Laboratory, a part of the University of California. A final divorce decree was entered on February 17, 1981, in our Second Judicial District Court. Under the decree, the mother received custody of Mary. The father received visitation privileges; he also was required to provide child support and health insurance for Mary.

In 1983, the mother petitioned the court to terminate her former husband's parental rights. The key issue underlying her petition appears to be his transsexuality. Prior to the 1981 medical diagnosis that the father was a transsexual, he had led a seemingly normal life. After high school, he received an appointment to the United States Naval Academy; however, he was unable to attend Annapolis because of poor eyesight. Instead, he enlisted in the United States Army and served honorably. Upon discharge, he attended the University of California at Berkeley. While at Berkeley, he worked at the Lawrence Berkeley Laboratory and double majored in Anthropology and in Slavic Language and Literature. After graduation, he continued to work for the Lawrence Berkeley Laboratory. His job, as a scientific research specialist, requires him to design and build complex research equipment and experimental devices. The parties also started to raise a family.

After their separation, the father had doubts about his gender identity. He consulted with Lynn Frazier, Ph.D., a psychotherapist specializing in the treatment of transsexuals. Dr. Frazier evaluated him for a potential gender identity problem and, using medical guidelines for the diagnosis of transsexuals, Dr. Frazier diagnosed him as a transsexual. Following Dr. Frazier's advice, the father than entered into the preoperative treatment regimen prescribed for transsexuals.

At the termination hearing, Ira Pauly, M.D., a psychiatrist and recognized expert in the field of transsexualism testified about the standards employed to screen candidates for sex reassignment surgery. Those standards require the candidate to undergo at least six months of psychological evaluation, to undergo a full year of hormonal therapy which allows the candidate to develop the secondary sexual characteristics of the opposite gender, and to undergo the "real life test" which requires the candidate to dress and act as a member of the opposite gender. According to Dr. Pauly, the length and depth of these tests permit the medical professionals evaluating the candidate to determine if he is psychologically prepared to live the remainder of his life as a member of the other gender. The testing also permits the candidate to decide whether he wants to go through the sex reassignment surgery. When the father completed the evaluation phase,

Dr. Frazier decided that he was a proper candidate for the surgical phase of the treatment. The surgery was then performed.

In 1981, after having been evaluated as a legitimate candidate[2] for sex reassignment surgery, the father revealed to his daughter that he had been diagnosed as a transsexual, and that his doctors had advised him to undergo sex reassignment therapy. Seeking to prepare her, he discussed with Mary what transsexuality is and what was going to happen to him. Mary, a bright child, apparently developed a reasonable understanding of what he explained to her. Before Mary returned to her mother, the father asked her to keep information secret from her mother; for he believed, correctly as matters turned out, that the mother would seek to use the information against him.

In February of 1982, Mary informed her mother that her father was a transsexual. Upon hearing this disclosure, the mother claimed to be worried about Mary's condition. After Mary had returned from her visit to Tim during the summer of 1981, the mother, in hindsight, thought that Mary had been quieter than normal. However, prior to the disclosure, it appears the mother had no special concerns over Mary's behavior. In addition, a neighbor and school teacher, both of whom knew Mary, did not notice any particular problems with Mary during this period either.

To resolve her concerns, the mother consulted a lawyer and had Mary visit a psychologist. As a result of these discussions, the mother unilaterally decided to deny the father visitation privileges, in violation of the divorce decree. Soon after the mother had made that decision, the father attempted to visit Mary in Reno. However, the mother, using the pretext of a nonexistent court order, had two sheriff's deputies intercept and deter the father before he was able to visit with Mary. Then, in August of 1982, the mother refused to pick up the father's birthday present for Mary at the post office. She also requested him to not telephone their residence.

Once again, in January of 1983, the father was barred from contacting Mary based upon the mother's assertion of another nonexistent court order. Later that day, he attempted to visit Mary at home; however, he was deterred by Mary's gun-wielding grandmother, who would not permit him to enter the premises.

After this incident, the mother sought and received a restraining order prohibiting the father from contacting Mary. She then

---

[2]Dr. Pauly stated, for example, that homosexuals are not appropriate candidates for sex reassignment surgery because, unlike a transsexual who does not accept his biological gender, a homosexual accepts his biological gender and thus does not require this surgery.

initiated the instant proceedings to terminate his parental rights. At the termination hearing, both parties testified. Expert testimony was also provided on transsexuality, on the father's medical treatment for transsexuality, and on Mary's psychological condition.

The district court then terminated the father's parental rights. In reaching its decision, the district court basically concluded that Mary would be better off if she did not visit him. The court reached this conclusion based upon its evaluation of the father's emotional stability and upon the potential influence of his friends on Mary. The district court also noted that his "selfishness" did not serve Mary's interests. In addition, the district court found that he had failed to support Mary.

## II

Termination of parental rights is governed by NRS 128.005 *et seq*. The grounds for termination of parental rights applicable to the father are listed in NRS 128.105-.107. Beyond the statutes, in reviewing a termination order, we look (1) for the existence of jurisdictional grounds, concerning a parent's conduct or capacity to raise a child, which fall below minimum standards, and (2) for the existence of dispositional grounds, concerning the child's interests, which require that the parental rights be terminated. Champagne v. Welfare Division, 100 Nev. 640, 647, 691 P.2d 849 (1984). To affirm a termination order, both types of grounds must exist. *Id.* at 640, 691 P.2d 849. In addition, the evidence supporting termination must be clear and convincing. Cloninger v. Russell, 98 Nev. 597, 598, 655 P.2d 528 (1982). I turn, therefore, to consider application of the *Champagne* test to the district court's order.[3]

## A

The district court identified several jurisdictional grounds. First, the district court noted that the father had abandoned Mary because of a lack of support and communication over a period of six months or longer. *See* NRS 128.105(1), (5)(a). The mother, however, played an instrumental role in inhibiting contacts with Mary, and manipulated sheriff's deputies and school officials to obstruct attempted visits. Considering these facts and others, we cannot properly ignore the obstacles the mother placed in the

---

[3]In applying *Champagne* to the district court's findings, I characterize the court's pre-*Champagne* decision in terms of *Champagne's* jurisdictional and dispositional categories. *See e.g.*, McGuire v. Welfare Division, 101 Nev. 179, 180-81, 697 P.2d 479 (1985).

father's way.[4] *See in re* Adoption of Doe, 677 P.2d 1070, 1074 (N.M.Ct.App.), *cert. denied,* 677 P.2d 624 (N.M. 1984). Despite such barriers, the father continued to maintain medical insurance for Mary. Unlike the case of Pyborn v. Quathamer, where no "real attempt" to communicate or to support the child occurred, 96 Nev. 145, 146, 607 P.2d 1141 (1980), he attempted to visit Mary, attempted to communicate with Mary, and did help support Mary. There is thus no clear and convincing showing of a conscious abandonment of Mary. *E.g., In re* Appeal in Maricopa County, Juvenile Action No. JS-3594, 653 P.2d 39, 43-44 (Ariz.Ct.App. 1982); *In re* Appeal in Pima County, Juvenile Action No. S-624, 616 P.2d 948, 950 (Ariz.Ct.App. 1980). Therefore, this jurisdictional ground fails.

The district court also found that Mary faced a risk of serious physical, emotional or mental injury *if the father exercises any parental rights.* However, without the exercise of visitation rights, which he is voluntarily foregoing, such injury admittedly cannot occur. Thus, this jurisdictional ground fails also.

Finally, the district court found that the father's selfishness, his unrealistic thinking about Mary, and his lifestyle adversely affect his ability to be a parent. Because he does not ask to exercise visitation rights, however, these considerations do not currently affect Mary's life. Therefore, the jurisdictional grounds invoked by the district court fail to provide an adequate basis to terminate the father's parental rights.

## B

The district court also found several categories of dispositional grounds. The district court noted that Mary should not be around someone with a gender identity problem, should not be in an environment where she might confront sexual minorities, and does not presently wish to be with her father. Again, without visitation, none of these concerns have substance. Therefore, this first category of dispositional grounds fails to justify a termination of the father's parental rights.

The second category of dispositional grounds raised by the district court concerned Mary's anxieties over the dispute between her parents. Yet, no judicial resolution of the instant appeal can stop any hostilities that exist between the parties. With the father foregoing any contact with Mary, little else can be done

[4]We further note that the father was attempting to regain visitation rights during this same period; he was hindered by counsel who evidently did not expeditiously aid his cause. Where a parent attempts through an attorney to regain his rights, we obviously should not hold that he has abandoned his child merely because of the seemingly ineffective assistance of counsel.

to resolve Mary's anxieties. Thus, this dispositional ground fails to justify a termination of all parental rights.

Finally, the district court noted that Mary does not now desire to be with appellant and believes he is no longer her father. I recognize the importance of considering a child's views of her parents where the child can sufficiently articulate her desires. NRS 128.107(2). Still, we also should recognize the importance of not severing a parent's rights where a less restrictive alternative exists to permit preservation of a family tie. *E.g., In re Brooks,* 618 P.2d 814, 822 (Kan. 1980). While Mary may no longer have a father figure, she still has a second parent who desires to contribute to her financial support, and who might someday in the future provide her with needed comfort, affection, and help.

### III

In conclusion, I reiterate that Mary and her father currently are totally separated, for he is willing to forego visitation rights at present, in order to maintain his legal status as Mary's parent. This separation protects Mary from all of the concerns, imagined or real, which underlay the district court's termination of parental rights.

A close reading of the majority opinion simply underscores this fundamental point. In attempting to justify the district court's ruling, the majority recite, *inter alia:* "The district court primarily focused upon the risk of serious physical, mental or emotional injury to the child *if visitation were resumed and the child were forced to maintain contact with appellant.*" (Emphasis added.) The majority also state: "At trial Dr. Weiheir, respondent's expert witness who examined Mary, testified that there is a serious risk of emotional or mental injury to the child *if she were allowed to be in her father's presence.*" (Emphasis added.) Again, the majority point out: "Dr. Weiheir, however, had the opportunity to observe and interview Mary and determined the risk to Mary would exist *only if visitation were forced upon Mary.* (Emphasis added.) The majority go on to assert: "Nevertheless, *if visitation were permitted,* there would be a risk of serious maladjustment, mental or emotional injury." (Emphasis added.) Hence, it is to be seen that the majority opinion is premised, not upon fact, but upon suppositions which are contrary to the facts and which ignore the appellant father's basic legal position.

As previously noted, the appellant father in this matter is a well educated person, long employed by one of this nation's eminent academic institutions. He served this country honorably in its armed forces, and, the record indicates, has never been known to violate any of our country's laws. Appellant fathered Mary Daly

in wedlock, and, since divorce, has maintained an interest in her and has continued attempts to provide for her, even though the respondent has improperly impeded those legitimate efforts.

In psychological distress, the father has consulted legitimate and respected medical authorities. The advice given by those medical authorities may offend the religious precepts of many. In the ultimate judgment of history, such advice may well yet be condemned as quackery. Still, I respectfully submit that a court of law should not stigmatize an emotionally distressed person for following the advice of highly trained and licensed physicians, who are practicing medicine under government authority, and who possess the most exalted credentials their profession can bestow. Nor should any parent be stigmatized for attempting to forewarn a child concerning medical procedures the parent is about to undergo pursuant to such advice.

Recognizing that the medical procedures he has undergone currently occasion distress to her child, the father does not contend he should now be allowed visitation rights. Rather, he contends merely that he has done nothing to warrant severing his formal legal parental tie to Mary Daly, apparently hoping that the passage of time will restore in Mary a desire to know him. In the meantime, the father recognizes, he would have to accept the duty of contributing to Mary's support, while foregoing visitation with the child.

As I assess the record, the fact that the appellant father has suffered emotional problems which are foreign to the experience of this court's members, and has followed the possibly poor advice of eminent medical authorities in his attempt to relieve them, does not justify a total and irrevocable severance of appellant's formal legal tie to a child he obviously cares about and desires to help nurture. By holding that such a severance is justified in these facts, it seems to me, we are being unnecessarily and impermissibly punitive to the exercise of a medical option we personally find offensive, thereby depriving a child of a legal relationship which might well be to the child's advantage in the future.